sel for indigent persons would be limited to prisoners.

 Rather than dispute the facts relating to the omitted financial information, plaintiff argues that the omissions were not intentional or in bad faith, but resulted from her ignorance of the requested information and her misunderstanding of the form's requirements. As to the former, inaccuracy based on ignorance or unnecessary haste is not excusable in formal, sworn Court filings which explicitly warn of the potentially serious consequences of false statement. This is particularly so where the omitted information is of such significant magnitude. As to the latter, the Court finds plaintiff's contentions belied by the explicit language of the form affidavit, the most important example being the affidavit's express inquiry concerning ownership of real estate. *Romesburg v. Trickey,* 908 F.2d 258, 260 (8th Cir.1990) [affirming decision of district court which had found plaintiff "not excused by his receipt of poor advice, inconsistent on its face with the Court's form of affidavit."]

The Court finds that plaintiff acted in bad faith in submitting her IFP motion and supporting financial affidavit. This finding is supported by the materiality of the omissions and misrepresentations, the lack of a credible "innocent" explanation therefor, and plaintiff's apparent total disregard for the truth, completeness and accuracy of the affidavit. For all the foregoing reasons, the Court concludes that plaintiff knowingly filed a false and inaccurate financial affidavit, and so made a false allegation of poverty to the Court, for which a dismissal with prejudice is appropriate under the authority of § 1915(e)(2)(A). *Romesburg,* 908 F.2d at 260; *Mathis v. New York Life Ins. Co.,* 133 F.3d 546, 547–48 (7th Cir.1998). The Court's determination to dismiss the action with prejudice is made as an exercise of the Court's discretion, after due consideration of the severity of such a sanction, but in view of the seriousness and scope of the information omitted from and understated in plaintiff's financial affidavit.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion to dismiss [Doc. # 57] is grant-

ed in part as to plaintiff's filing a false allegation of poverty, and is otherwise denied as moot.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment [Doc. # 59] and motion to strike affidavits and unsworn psychiatric evaluation [Doc. # 67] are denied as moot.

**ASOCIACION COLOMBIANA de EXPORTADORES de FLORES, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Floral Trade Council, Defendant–Intervenor.**

Slip Op. 98–33.
Court No. 96–09–02209.

United States Court of International Trade.

March 25, 1998.

Order Denying Reconsideration
July 2, 1998.

Arnold & Porter (Michael T. Shor), Washington, DC, for Asocolflores, Flores del Rio Group, and Florex Group.

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Patrick F.J. Macrory, Spencer S. Griffith, Lee Harriss Roberts, J. David Park), Washington, DC, for Eden Floral Farms, Equiflor, Espirit Miami, Floralex Ltda., Agrodex Group, Caicedo Group and Santana Group.

White & Case (Alan M. Dunn, Kristina Zissis), Washington, DC, for HOSA Group.

Frank W. Hunger, Asst. Atty. Gen. of U.S.; David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice; Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice; of counsel, Lucius B. Lau, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for Defendant; Karen L. Bland, Jeffrey C. Lowe, Bernd G. Janzen, Sanjay J. Mullick, Attorney–Advisors, Office of Chief Counsel for Import Admin., Dept. of Commerce, Washington, DC, for Defendant.

Stewart and Stewart (Mara Burr, James R. Cannon, Jr., Amy S. Dwyer, Terence P. Stewart), Washington, DC, for Floral Trade Council.

### OPINION

POGUE, Judge.

This matter is before the Court on the motion of Plaintiffs, Asocolflores[1], sixteen individual producers, exporters and importers of fresh cut flowers from Colombia, and Defendant–Intervenor, the Floral Trade Council ("FTC"), for judgment on the agency record, pursuant to U.S. CIT Rule 56.2. The parties filed separate actions challenging certain aspects of the Department of Commerce's final results of the consolidated fifth, sixth, and seventh administrative reviews of the antidumping duty order on Certain Fresh Cut Flowers From Colombia. The actions were consolidated.

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994) and 19 U.S.C. § 1516a(a)(2)(B)(iii)(1994).

---

1. Plaintiff Asocolflores includes, Asociacion Colombiana de Exportadores de Flores, the Association of Floral Importers of Florida and 81 individual Colombian producers.

The sixteen producers/exporters/importers consist of the following: (1) Flores del Rio Group, (2) HOSA Group, (3) Eden Floral Farms, (4) Equiflor, (5) Espirit Miami, (6) Floralex, Ltda., (7) Flores de Exportacion S.A., (8) Agricola Guacari, S,A., (9) Flores Altamira, S.A., (10) Four Farmers Inc., (11) Santa Helena, S.A., (12) Flores Del Salitre Ltda., (13) S.B. Talee De Colombia Ltda., (14) Agrodex Group, (15) Caicedo Group, and (16) Santana Group.

The parties raise eleven issues: (1) inflation adjustments; (2) imputed U.S. credit expenses; (3) U.S. selling expenses; (4) allocation of cost of production; (5) application of best information available; (6) collapsing parties; (7) interest income offset; (8) commissions paid to related consignees; (9) calculation of foreign market value; (10) third country selling expenses; and (11) cash deposit instructions.[2]

## BACKGROUND

Following investigations by the Department of Commerce ("Commerce" or "Department") and the U.S. International Trade Commission, an antidumping duty order was entered against Certain Fresh Cut Flowers From Colombia in 1987. That antidumping duty order covered standard carnations, miniature (spray) carnations, standard chrysanthemums, and pompon chrysanthemums. *See Certain Fresh Cut Flowers From Colombia,* 52 Fed.Reg. 8,492 (Dep't Commerce March 18, 1987)(amend. final det.). The order imposed an estimated antidumping duty rate on all entries of the subject merchandise for the period of investigation ("POI"). *See* Sections 735, 736 of the Tariff Act of 1930, as amended 19 U.S.C. §§ 1673d(c), 1673e (1988). It also established the duty deposit rate for all merchandise entered after the issuance of the order and prior to the issuance of a revised rate pursuant to section 1675. *Id.*

The antidumping statute provides for the Department of Commerce to conduct an administrative review of an antidumping duty order upon the request of an interested party. 19 U.S.C. § 1675. As a result of the administrative proceeding, Commerce determines the actual antidumping duty rate for the entries covered by that administrative review, which also establishes the duty deposit rate for future entries. 19 U.S.C. § 1675(a)(2).

In the present case, Commerce initiated the fifth administrative review of fresh cut flowers from Colombia, on May 21, 1992, covering over 400 Colombian firms for the period March 1, 1991, through February 29, 1992. *See Certain Fresh Cut Flowers From Colombia,* 57 Fed.Reg. 21,643 (Dep't Commerce 1992)(init.admin.reviews).

On May 28, 1993, Commerce initiated the sixth administrative review of fresh cut flowers from Colombia for the period March 1, 1992, through February 28, 1993. *See Certain Fresh Cut Flowers From Colombia,* 58 Fed.Reg. 31,010 (Dep't Commerce 1993)(init.admin.reviews).

On May 2, 1994, Commerce initiated the seventh review for the period March 1, 1993 through February 28, 1994. *See Certain Fresh Cut Flowers From Colombia,* 59 Fed. Reg. 22,579 (Dep't Commerce 1994)(init.admin.reviews). On May 9, 1994, Commerce notified the interested parties of its decision to conduct the fifth, sixth and seventh administrative reviews concurrently and informed them that all subsequent responses should be submitted for the three review periods. On June 8, 1995, Commerce published the preliminary results of these consolidated reviews. *Certain Fresh Cut Flowers From Colombia,* 60 Fed.Reg. 30,270 (Dep't Commerce 1995)(prel. results admin. reviews)[hereinafter preliminary results]. The final determination followed on August 19, 1996. *Certain Fresh Cut Flowers From Colombia,* 61 Fed.Reg. 42,833 (Dep't Commerce 1996)(final results admin. reviews)[hereinafter final determination].[3]

2. On November 21, 1997, Defendant–Intervenor, FTC, filed a motion for oral argument. As the issues in this case have been thoroughly briefed by the parties, the Court denies the motion for oral argument.

3. These reviews were initiated prior to December 31, 1994. Consequently, the applicable statutory provisions are those that existed on December 31, 1994, prior to the amendments made by the Uruguay Round Agreements Act, Pub. Law 103–465, 108 Stat. 4809. *Torrington Co. v. United States,* 68 F.3d 1347, 1352 (Fed.Cir.1995).

## STANDARD OF REVIEW

The antidumping statute provides for the judicial review of the administrative review determination. 19 U.S.C. § 1516a. In reviewing the final results of an administrative review, the Court of International Trade must decide whether Commerce's determination is in accordance with law and whether Commerce's conclusions are supported by substantial evidence on the record. *See* 19 U.S.C. § 1516a(b)(1)(B).

In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with law, this court applies the two-step analysis articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), as applied and refined by the Federal Circuit. The first task is "to determine whether Congress has 'directly spoken to the precise question at issue.'" *Id.* If the statute unambiguously deals with the subject matter in issue, the court, as well as the agency, must give effect to the intent of Congress. *Id.; see, e.g., Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398, 402–403 (Fed.Cir.1994); *Zenith Electronics Corp. v. United States,* 988 F.2d 1573, 1582 (Fed.Cir.1993).

"The primary source for determining legislative intent is the statutory language itself, 'which is presumed to be used in its normal sense, in the absence of proof of a special meaning in the trade.'" *Holford USA Ltd. v. United States,* 19 CIT 1486, 1493, 912 F.Supp. 555, 561 (1995) (quoting *United States v. Esso Standard Oil Co.,* 42 C.C.P.A. 144, 151 (1955)); *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993); *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992).

"If the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. Considerable weight is accorded Commerce's construction of the antidumping laws, whether that construction manifests itself in the application of the statute, *see, e.g., Daewoo Electronics Co., Ltd. v. Int'l Union of Elec., Technical, Salaried and Mach. Workers,* 6 F.3d 1511, 1516 (Fed.Cir.1993), *cert denied,* 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994); *Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1039 (Fed.Cir.1996), or in the promulgation of a regulation, *see, e.g., Smith–Corona Group v. United States,* 713 F.2d 1568, 1575 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

When examining Commerce's factual determinations to decide whether they are supported by substantial evidence, the court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [Commerce's] conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)(quoted in *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir. 1984)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

## DISCUSSION

Commerce calculates an antidumping duty by comparing an imported product's price in the United States to the foreign market value ("FMV") of comparable merchandise. The duty is the amount by which the merchandise's FMV exceeds its United States price ("USP"). *See* 19 U.S.C. § 1673. Foreign market value is the price of the merchandise in the producer's home market or its export price to countries other than the United States. 19 U.S.C. § 1677b(a)(1).

Foreign market value is computed by one of three methods: (1) home market sales; (2) third country sales; or (3) constructed value. *See* 19 U.S.C. § 1677b(a). When constructed value ("CV") is used, the antidumping statute provides that CV shall be the sum of the "cost of materials ... and of fabrication ... employed in producing such or similar merchandise" plus "an amount for general expenses and profit" and the cost of packing the merchandise for shipment to the United States. *See* 19 U.S.C. § 1677b(e)(1)(A), (B), (C).

## I.

## INFLATION ADJUSTMENTS

### *Plaintiff Asocolflores* [4]

■ In the preliminary results, Commerce stated that due to a change in Colombian generally accepted accounting principles ("GAAP"), the Department would ask respondents for additional data to make inflation adjustments to reported expenses and costs. *Preliminary Results,* 60 Fed.Reg. at 30,274. On June 21, 1995, Commerce issued a supplemental questionnaire asking respondents to revise their previously submitted figures to account for the effects of inflation on depreciation expenses and amortized pre-production costs.[5] Pub. Doc. No. 1508, Fiche 424, Asocolflores App., Ex. 3. In July 1995, Asocolflores submitted revised calculations. In their response, Asocolflores explained that, in accounting for inflation, they had adjusted fixed and deferred asset values, accumulated depreciation and amortization, depreciation and amortization expenses, and raw material inventories. *See* Asocolflores App., Ex. 5 (Memorandum from Catherine Miller to Laurie Parkhill, dated October 24, 1995). In addition, Asocolflores noted that

they had claimed as an offset to production costs the net monetary correction income that results from the recording of inflation adjustments to depreciable assets. *Id.*

In the final determination, Commerce calculated foreign market value based on constructed value. 61 Fed.Reg. at 42,836. Commerce used respondents' inflation adjusted depreciation and amortization expenses in calculating CV. *Id.* at 42,844. Commerce, however, excluded from its calculation the monetary correction income claimed by the respondents. *Id.*

Asocolflores argues that Commerce's decision to limit inflation adjustments to depreciation expenses and amortized pre-production costs was not in accordance with law. Asocolflores' Mem. Supp. Mot. J. Agency R. at 8 [hereinafter Asocolflores Brief].

There is no statutory directive for measuring the effects of inflation in an antidumping analysis. Because the statute is silent, the Court must determine whether the agency has made a reasonable interpretation of the statutory provision. *Shieldalloy Metallurgical Corp. v. United States,* 20 CIT ——, ——, 947 F.Supp. 525, 529 (1996) (quoting *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782).

Commerce ordinarily determines the costs of production by using actual historical costs. However, in an economy marked by high inflation,[6] historical costs that are not adjusted for inflation result in an understatement of costs. Consequently, in cases where the home market economies exhibit significant inflation, Commerce has adjusted respondents' depreciation expenses in order to permit a more appropriate matching of costs and prices based on equivalent currency units.[7] 61 Fed.Reg. at 42,845.

**4.** Plaintiffs, the Agrodex Group, the Caicedo Group, and the Santana Group adopt all of the arguments presented by Plaintiff Asocolflores in support of their Rule 56.2 motion for judgment on the agency record. Agrodex Group, Caicedo Group, and Santana Group Mem. Supp. Mot. J. Agency R. at 1.

**5.** "Depreciation expenses" include the depreciation of buildings, equipment and other capital assets. See Pub. Doc. No. 450, at 67. "Amortization expenses" include pre-production costs

such as labor, fertilizer, cuttings and water. *Id.* at 64–67.

**6.** In the five years leading up to and including this period of review ("POR"), the Colombian economy experienced inflation rates between 20% and 30%. 61 Fed.Reg. at 42,845.

**7.** In contrast, in cases involving respondents whose home market economies are hyperinflationary (annual inflation rate greater than 50%), Commerce adjusts all production costs for the

Colombian law requires companies to make certain adjustments to both their reported income and expenses under a "system of integral adjustments for inflation." *See* Asocolflores App., Ex. 4, at 2 (Peat Marwick Analysis Memorandum on Colombian Inflation Adjustments)[hereinafter Peat Marwick Memo]. Specifically, Colombian inflation accounting requires the calculation of a "monetary correction" that adjusts costs for the effects of inflation on a company's net monetary position—monetary liabilities (such as loans and accounts payable) less monetary assets (such as cash on hand and accounts receivable).[8]

Asocolflores argues that Commerce unlawfully disregarded the effects of inflation on financial expenses as required by Colombian GAAP.[9] Asocolflores Brief at 7. Specifically, Asocolflores maintains that Commerce should have reduced production costs by the amount of the "difference between required inflation adjustments and accumulated depreciation." *Id.* at 21.

The suggested adjustment, however, "represents only part of the overall inflation adjustments required [by Colombian GAAP] to restate profits to year-end currency levels." Pub. Doc. No. 1710, Fiche 465, Fr. 1 at 8, Asocolflores App., Ex. 5 (Office of Accounting Memorandum on Administrative Reviews of Certain Fresh Cut Flowers from Colombia, Oct. 24, 1995). Commerce appropriately rejected the adjustment because it represents

---

effects of inflation by using monthly replacement costs. See e.g., Ferrosilicon From Brazil, 59 Fed.Reg. 732, 733 (Dep't Commerce 1994)(final det.)("We determine Brazil's economy to be hyperinflationary. Therefore, in order to eliminate the distortive effects of inflation, consistent with past practice, we calculated separate weighted-average FMVs, COPs, and CVs for each month.").

8. To explain: with respect to depreciable assets, Colombian tax law requires adjustments to both the balance sheet and income statements. See Peat Marwick Memo at 2. First, the value of assets must be adjusted by the real increment due to inflation. The asset value is multiplied by the percent annual inflation rate ("PAAG"), the government published inflation index. This amount is then recorded as a debit to the asset account and a credit to a "monetary correction" account required to be established. *Id.* Second, the upward adjustment to the value of the asset leads to an upward adjustment to depreciation expense. *Id.* at 3. The asset value as adjusted for inflation is divided by the asset's useful life to calculate the depreciation expense for the period. This amount, the depreciation calculated at historical cost plus the adjustment due to inflation, is then recorded as a debit to the depreciation expense account and a credit to the accumulated depreciation account. *Id.* Third, the accumulated depreciation account must be adjusted for inflation. This is performed by multiplying the accumulated depreciation account by the PAAG. This amount is then debited to the monetary correction account and credited to the accumulated depreciation account. *Id.*

9. During the administrative review, Asocolflores maintained that Commerce should have reduced production costs by the amount of the "difference between required inflation adjustments to asset values and accumulated depreciation." Pub. Doc. No. 1695, at 21 (Asocolflores' Administrative Case Brief, Aug: 11, 1995)[hereinafter

Asocolflores Case Brief]. Before this Court, Asocolflores argues that Commerce should adjust production costs by the amount of the income from the net monetary correction (the newly stated asset values less increased equity). Asocolflores Brief at 13. Commerce responds that the adjustment presented by Asocolflores here is "wholly different than" the monetary correction presented during the administrative review. Def.'s Mem. Opp'n Asocolflores' Mot. J. Agency R. at 21. Therefore, Commerce maintains, Asocolflores has failed to exhaust its administrative remedies with regard to this "new" adjustment. *Id.* The Court does not agree.

At the administrative level Asocolflores challenged Commerce's decision to limit inflation adjustments to depreciation expenses and amortization costs. 61 Fed.Reg. at 42,845. Asocolflores argued that the Department should not make a one-sided adjustment for inflation to depreciation expenses and amortized costs, but should also factor in an adjustment to account for the effects of inflation on the company's net monetary position. *Id.* Asocolflores sufficiently raised the issue presented, whether Commerce erred in making adjustments for inflation, notwithstanding that Asocolflores has shifted its argument as to what type of adjustment should be made. See *Usinor Sacilor v. United States*, 18 CIT 1155, 1165–66, 872 F.Supp. 1000, 1009–10 (1994)(finding foreign manufacturer of steel products sufficiently raised issue regarding coding of steel products before Commerce, by asserting that the Department should not apply punitive best information available margin). Moreover, the record reveals that Asocolflores did, toward the conclusion of the administrative hearing, argue for a "net" adjustment comparable to that presented here. See Administrative Hearing, Sept. 8, 1995, Def.'s Mem. Opp'n Asocolflores' Mot. J. Agency R., Ex. 3 at 86–88. Accordingly, the Court will address Asocolflores' arguments regarding the net adjustment.

only the first aspect of Colombian inflation accounting—a debit to non-monetary assets corresponding to a credit to the monetary correction account. *Id.* Att. 1.

■ Commerce's practice is to adhere to an individual firm's recording of costs in accordance with GAAP of its home country if the Department is satisfied that such principles reasonably reflect the costs of producing the subject merchandise. *See e.g., FAG U.K. Ltd. v. United States,* 20 CIT —, —, 945 F.Supp. 260, 271 (1996)("Commerce's reliance on an individual firm's home country GAAP provides an objective standard by which to measure costs, and allows a respondent a predictable basis on which to compute costs."). Commerce may, however, reject the use of home country GAAP as a basis for calculating production costs if the accounting methods at issue unreasonably distort or misstate costs for purposes of an antidumping analysis.[10] *Laclede Steel Co. v. United States,* 18 CIT 965, 975 (1994); *Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT 526, 533 n. 12, 717 F.Supp. 834, 841 n. 12 (1989).

10. As discussed previously, Colombian GAAP requires companies to increase fixed assets by an amount equal to the year's inflation index. At the same time, this amount is recorded as a debit to the asset account. A corresponding "credit" is then recorded to the monetary correction account. Asocolflores argues that Commerce made a one-sided adjustment by ignoring the "credit" to income. Asocolflores Brief at 11–12. The Court disagrees. Commerce found that the revaluation of flower plants and other fixed asset costs to account for the effects of inflation does not, in and of itself, create income related to flower production. 61 Fed.Reg. at 42,845. Thus, Commerce appropriately concluded that the "debits" to fixed assets, i.e., the flower plants, and the "credit" to financial income are in no way related for purposes of calculating CV. *Id.*

11. Asocolflores also argues that Commerce should have adjusted production costs by the amount of income from the net monetary correction. Asocolflores Brief at 15. Asocolflores alleges "in numerous other cases involving identical or equivalent inflation accounting, both this court and ITA have expressly recognized that the *monetary correction must be taken into account* in calculating costs of production and constructed value." *Id.* Asocolflores cites Gray Portland Cement From Mexico, 58 Fed.Reg. 25,803, 25,806 (Dep't Commerce 1993)(final det.), and Por-

Asocolflores alleges that Commerce failed to comply with the Department's own interpretation because it made no finding that the GAAP of Colombia does not reasonably reflect all costs of production.[11] Asocolflores Brief at 15. Asocolflores is mistaken. Commerce found that the inflation accounting adjustment to fixed assets does not "create income." 61 Fed.Reg. at 42,845. In the final determination, Commerce explained:

The fact that a company may own fixed assets does not in some way earn that company income simply as a result of accounting for inflation. Rather ownership of fixed assets at best acts as a hedge against inflation, neither creating nor generating a loss in asset value.... The revaluation of flower plants and other fixed asset costs to account for inflation does not, in and of itself, create income. Further, it does not create income related to flower production.

*Id.*

Because the antidumping statute instructs Commerce to determine the constructed val-

celain–On–Steel Cookware From Mexico, 61 Fed. Reg. 54,617, 54,619 (Dep't Commerce 1996)(final det.), to support this proposition. These cases, however, are inapposite. Mexican GAAP differs from Colombian GAAP. In the final determination, Commerce explained:

It is important to note that inflation accounting practices vary from country to country. In the cases cited by respondents, under Mexican GAAP, the Department's acceptance of the monetary correction related solely to each respondent's financing expenses and not, as Asocolflores asserts, to the fixed assets and depreciation expenses.

61 Fed.Reg. at 42,845–46.

Asocolflores also cites to *AIMCOR, Alabama Silicon, Inc. v. United States,* 19 CIT 966, 1995 WL 431186 (1995), to support its argument. However, Aimcor does not support Asocolflores' position either. In *AIMCOR,* the court rejected Commerce's use of a monetary correction because "the evidence supporting a monetary correction on the basis that Minasligas' loans were indexed for inflation is uncertain." *AIMCOR,* 19 CIT at 975, 1995 WL 431186. On remand, Commerce rejected the monetary correction, instead applying a different methodology "with the monetary correction subtracted out...." *Aimcor, Alabama Silicon, Inc. v. United States,* 20 CIT —, —, slip op. 96–79, at 3, 1996 WL 276955 (1996).

ue of a particular product, the Department only offsets production costs with income that is related to the production of the subject merchandise or related to the general operations of the company.[12] *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France,* 57 Fed.Reg. 28,360 (Dep't Commerce 1992)(final det.)(finding that income from the sale of land did not relate to production costs for manufacturing bearings); *Silicon Metal From Brazil,* 56 Fed.Reg. 26,977 (Dep't Commerce 1991)(final det.)(finding the monetary correction required under Brazilian GAAP does not reasonably reflect the costs of producing silicon metal because the monetary correction does not specifically relate to the product, nor to the period of review, and thus, it would be distortive to apply this adjustment to the subject merchandise). This approach has been approved by this court. *See Camargo Correa Metais S.A. v. United States,* 17 CIT 897, 899, 1993 WL 366964 (1993)(noting that the monetary correction is an aggregate inflation adjustment restating owner's equity and permanent assets and does not specifically relate to the product, nor to the period of review and thus, it would be distortive to apply this adjustment). Because the monetary correction does not relate to flower production, Commerce's decision not to adjust for the monetary correction is a reasonable interpretation of the statute and is therefore in accordance with law.

12. In *U.S. Steel Group v. United States,* 21 CIT ——, ——, 998 F.Supp. 1151 at 1153–54 (Feb. 25, 1998), this Court found that Commerce's calculation of the respondent's cost of production appropriately included an offset to general and administrative expenses for miscellaneous income. Commerce determined that where the income bears a relationship to the production of the subject merchandise, it may be accounted for as part of the cost of. manufacture of that merchandise. *Id.* at 1153. Where the income is related to the general manufacturing operations of the company, it is appropriate to treat it as part of general and administrative expenses. *Id.* Because Commerce found that the monetary correction here does not create income related to flower production, this case is distinguishable from U.S. Steel.

## II.

## IMPUTED CREDIT

### Plaintiff Asocolflores

■ In calculating constructed value, Commerce calculates selling expenses for all companies under review. As part of its calculation of selling expenses for U.S. sales, Commerce imputes a credit expense on sales to represent the cost (based upon the time value of money) to the seller of waiting for payment for its sales.[13] Commerce calculates imputed credit expenses for sales in both the U.S. and home markets.

In the final determination, for those companies that had actual U.S. loans during the period of review, Commerce calculated the U.S. credit expense using interest rates associated with those loans. 61 Fed.Reg. at 42,848. For those companies that did not have actual U.S. loans during the POR, but financed working capital through a Colombian peso-borrowing, Commerce used a peso-based interest rate for the U.S. credit calculation. *Id.*

Asocolflores argues Commerce's methodology for the companies that did not have actual U.S. loans was not in accordance with law. Asocolflores Brief at 17. Specifically, Asocolflores contends, because these sales were made in U.S. dollars, Commerce should have used a U.S. dollar short-term interest rate in its calculation. *Id.* at 18. Asocolflores also argues that Commerce's methodology is contrary to the principles articulated in *LMI–La Metalli Industriale, S.p.A. v.*

13. The relevant statutory provision relating to circumstances of sale ("COS"), provides:

In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to ...; (B) other differences in circumstances of sale; ..., then due allowance shall be made therefor.

*See* 19 U.S.C. § 1677b(a)(4)(B). Implementing this section, 19 C.F.R. § 353.56 provides, differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms. See 19 C.F.R. § 353.56(a)(2).

*United States,* 912 F.2d 455 (Fed.Cir.1990). *Id.* at 17.

In *LMI–La Metalli,* the court rejected Commerce's presumption that an Italian manufacturer would get financing from an Italian financial institution regardless of how unfavorable the interest rate and regardless of whatever financing alternatives existed. *LMI–La Metalli,* 912 F.2d at 460 (finding in light of commercial reality, it is not reasonable to presume that a commercial enterprise would borrow at almost twice the available rate).

After *LMI–La Metalli,* Commerce proposed a new policy for selecting interest rates to be used in imputing credit calculations. Commerce shifted its focus from the cost of borrowing to the currency in which the sale is denominated. In situations where the respondent has no short-term borrowings in the currency of the transaction, Commerce suggested it can (1) accept "external" information about the cost of borrowing in the relevant currency; or (2) adjust for the application of a single, observed interest rate to both home market and U.S. sales, taking into account the exchange rate fluctuations between the two currencies. Asocolflores App., Ex. 7 (Memorandum from the Director of the Office of Investigations to the Deputy Assistant Secretary for Investigations, Sept. 6, 1994). Commerce's proposed policy was implemented in *Certain Corrosion–Resistant Carbon Steel Flat Products From Australia,* 61 Fed.Reg. 14,049 (Dep't Commerce 1996) (final det.). Commerce stated:

> When a respondent has no U.S. borrowings, it is no longer the Department's practice to substitute home market interest rates when calculating U.S. credit expenses.... Rather, the Department will now match the interest rate used for credit-texpenses to the currency in which the sales are denominated.... Where there

is no borrowing in a particular currency, the Department may use external information about the cost of borrowing in that currency.... *In the absence of U.S. dollar borrowings, we need to arrive at a reasonable surrogate for imputing U.S. credit expenses.*

*Id.* at 14,054 (emphasis in the original). Following *Carbon Steel,* in several cases where there were no borrowings in the currency of the sales made, Commerce used external information about the cost of borrowing in a particular currency. *See e.g., Cut–to–Length Carbon Steel Plate From Sweden,* 61 Fed. Reg. 15,772, 15,780 (Dep't Commerce 1996)(final det.)(using the average short-term lending rate as calculated by the U.S. Federal Reserve Bank for imputing U.S. credit expenses); *Certain Pasta From Turkey,* 61 Fed.Reg. 30,309, 30,324 (Dep't Commerce 1996)(final det.)(using a U.S. dollar short-term interest rate obtained from public information).

In the present case, for the respondents that had no U.S. borrowings, Commerce took each company's actual Colombian peso-borrowing rate and subtracted the rate of devaluation of the peso against the dollar over the applicable POR, reasoning that home market interest rates so adjusted are "reasonable surrogates" for U.S. interest rates. 61 Fed. Reg. at 42,848–49. Asocolflores argues that Commerce's approach unlawfully deviates from its practice established under *LMI–La Metalli.*[14] Asocolflores Brief at 19. Asocolflores maintains that the Department's methodology results in a gross overstatement of U.S. credit expenses that significantly distorts the antidumping margins found by Commerce. *Id.* The Court does not agree.

First, Commerce's methodology is compatible with LMI–La Metalli. The LMI–La Metalli court based its holding, in part, on

---

**14.** Asocolflores also argues that under *AIMCOR,* 19 CIT 966, 1995 WL 431186 Commerce is required to "use U.S. interest rates for calculating credit expense on U.S. dollar-denominated sales." Asocolflores Brief at 18. Asocolflores' reliance on AIMCOR is inapposite. In AIMCOR, the court granted Commerce's request for a remand in light of AIMCOR'S contention that Commerce's "application of a cruzeiro-denominated interest rate to a U.S. dollar-denominated

USP is unsupported by substantial evidence," where the respondent had a U.S. loan. *AIMCOR,* 19 CIT at 973, 1995 WL 431186. The present case is distinguishable because the respondents did not have any U.S. loans. Thus, AIMCOR does not diminish Commerce's authority as established under LMI–La Metalli to use an interest rate for imputed credit that reflects "commercial reality."

the fact that "LMI provided evidence that it had obtained dollar-denominated loans," and could be expected to use such financing with respect to its U.S. sales. *LMI–La Metalli,* 912 F.2d at 460. Asocolflores alleges that all companies at issue had access to dollar-denominated loans. Asocolflores Brief at 20. However, Asocolflores has presented no evidence on the record demonstrating that U.S. dollar-denominated loans were actually available or that Colombian companies could be expected to use such loans.[15]

More importantly, Commerce's approach was consistent with its practice established after LMI–La Metalli of matching the interest rate used for credit expenses to the currency in which the sales are denominated. Commerce's practice had not changed from one review to the next[16]; all that changed, was Commerce's determination of what a reasonable surrogate for imputing U.S. credit expenses was in the present case.[17] In the final determination, Commerce explained:

We note that *Steel* does not state that, in the absence of U.S. dollar-denominated loans, the Department will impute credit expenses based on 'external information.' Rather, *Steel* states that the Department will use a reasonable surrogate for imputing U.S. credit expenses. Respondents' actual peso-denominated short-term borrowing rates, adjusted for the rate of appreciation of the dollar against the peso,

are reasonable surrogates for U.S. dollar short-term borrowing rates. Such rates are reasonable because the cost of extending credit to customers can be measured by a company's actual short-term borrowing experience.

61 Fed.Reg. at 42,849. Commerce's determination that the Colombian producers' borrowing experience was a surrogate for the cost of extending credit to their U.S. customers was reasonable.

However, Commerce's determination also must be supported by substantial evidence. The problem here is that Commerce failed to cite evidence to support the conclusion that its methodology—adjusting for the devaluation of the peso against the dollar—is well-founded. Commerce merely noted that its adjustment's purpose was not to get dollar terms of the peso-borrowing rate but to get real terms of the peso-borrowing rate. 61 Fed.Reg. at 42,850. Beyond this statement, Commerce provided no explanation as to why it simply subtracted the devaluation rate from the peso-borrowing rate. Therefore, the Court is remanding this issue to Commerce for reconsideration. See *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)(stating that if the contemporaneous explanation of the agency is based on a finding that is not sustainable on

15. Commerce also notes that during the fourth administrative review, "respondents implied that adjusted peso-denominated short-term borrowing rates did reflect economic reality." 61 Fed. Reg. at 42,849.

16. The change at issue here does not involve a new methodology or a change in practice. See, e.g., *Hussey Copper, Ltd. v. United States,* 18 CIT 454, 457–58, 852 F.Supp. 1116, 1120 (1994)("[Respondent] had no reason to believe that its method did not provide the 'best estimates' of the ... cost, since the same method had been accepted and verified by Commerce in the previous investigation and Commerce never indicated during the proceeding of this administrative review that [respondent's] method was unacceptable."). Thus, no issues of statutorily implied standards of procedural fairness are implicated.

17. Asocolflores reads the policy memorandum in which Commerce proposed its new practice as requiring the use of external information as to

actual dollar interest rates. Asocolflores Brief at 21. However, the memorandum clearly presents two options:

In [situations where the respondent has no short-term borrowings in the currency of the transaction]there are two broad possibilities. First, we could accept 'external' information about the cost of borrowing in a particular currency.... The second possibility is 'to adjust' for the application of a single, observed interest rate to both the homemarket and U.S. sales.

Asocolflores App., Ex. 7, at 2 (Memorandum from the Director of the Office of Investigations to the Deputy Secretary for Investigations, Sept. 6, 1994). The recommendation made stated "[w]e adopt a policy of calculating credit adjustments using the interest rate applicable to the currency in question." *Id.* at 3. The memorandum acknowledged the acceptability of using borrowing rates incurred in a different currency from that of the transaction (if the rates are adjusted for exchange rate fluctuations). 61 Fed. Reg. at 42,849.

the administrative record, the matter must be remanded for further consideration).

## III.

### U.S. SELLING EXPENSES

#### *Plaintiff Asocolflores*

■ In calculating constructed value in the preliminary results, Commerce used U.S. selling expenses incurred in Colombia (on export sales) for purposes of calculating a surrogate value for selling expenses. 61 Fed.Reg. at 42,843. In the final determination, in addition to the U.S. selling expenses incurred in Colombia, Commerce added to constructed value U.S. selling expenses incurred in the United States. *Id.*

Asocolflores argues that Commerce should have used only those U.S. selling expenses incurred in Colombia in its CV calculation. Asocolflores Brief at 24.

The statute requires Commerce to include in its calculation of constructed value an "amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation...." 19 U.S.C. § 1677b(e)(1)(B). Similarly, Commerce's regulations provide in relevant part that constructed value shall include "[g]eneral expenses and profit usually reflected in sales of merchandise of the same class or kind as the merchandise by producers in the home market country, in the usual commercial quantities and in the ordinary course of trade...." 19 C.F.R. § 353.50(a)(2). The statute, however, does not define "general expenses" or explain how they are to be calculated. See 19 U.S.C. § 1677b(e)(1)(B). Because the statute is silent, the Court must defer to

Commerce's reasonable interpretation. *Daewoo Elec.*, 6 F.3d at 1516.

Commerce includes selling expenses as a component of general expenses in its calculation of constructed value. *Timken Co. v. United States*, 11 CIT 786, 798, 673 F.Supp. 495, 508 (1987). Commerce's practice has been to use U.S. selling expenses as a surrogate for home market selling expenses when home market sales information is inadequate.[18] Asocolflores maintains the statute directs that the only expenses to be added to constructed value are those actually incurred in the home market. Asocolflores Brief at 26. But the relevant provisions only require that general expenses be those "usually reflected" in "sales of merchandise" that are "of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation." *See* 19 U.S.C. § 1677b(e)(1)(B). Commerce explained that the use of all selling expenses, "regardless of whether these expenses were incurred by the flower grower, its offshore invoicer, or its related U.S. importer ... allows [Commerce] to utilize the entire universe of U.S. selling expenses as the surrogate, regardless of any internal corporate decision as to whether certain selling expenses should be incurred in Colombia or transferred to an offshore invoicer or an affiliated U.S. importer." 61 Fed.Reg. at 42,843. Commerce's approach was reasonable because by including selling expenses associated with U.S. sales, Commerce ensured that its calculation of general expenses would remain unaffected by the shifting of expenses between the exporter and any related U.S. importer.

■ Asocolflores also argues that Commerce's departure from its practice in the preliminary results without providing notice to the parties or an opportunity to comment was not in accordance with law.[19] Asocolflores Brief at 25. But Commerce has the

---

18. See e.g., Fresh Cut Roses From Ecuador, 60 Fed.Reg. 7,019, 7,029 (Dep't Commerce 1995)(final det.) (using U.S. selling expenses as a surrogate even though certain producers had viable home markets for culls which are included in the general class or kind of merchandise); Mechanical Transfer Presses From Japan, 54 Fed.Reg. 34,208, 34,210 (Dep't Commerce 1989)(prel.det.)(adding U.S. selling expenses as a

surrogate for sale-specific home market expenses).

19. Asocolflores also argues that it was arbitrary and unfair of Commerce to apply its change in practice retroactively and contrary to the principles articulated in *Shikoku Chem. Corp. v. United States*, 16 CIT 382, 795 F.Supp. 417 (1992)(finding that it was unreasonable for Commerce to alter a methodology that had been consistently

flexibility to change its position providing that it explain the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence.[20] In the final determination, Commerce recognized that it was departing from prior practice. Commerce stated:

For the preliminary results and in prior reviews of this order, we used only those U.S. selling expenses incurred in Colombia for purposes of calculating a surrogate value for selling expenses. However, we have revised this figure in these final results to include all U.S. selling expenses, regardless of whether these expenses were incurred by the flower grower, its offshore invoicer, or its related U.S. importer.

61 Fed.Reg. at 42,843. Further, Commerce clearly articulated the basis for its change. As noted, Commerce's revised methodology allowed the Department "to utilize the entire universe of U.S. selling expenses as the surrogate, regardless of any internal corporate decision as to whether certain selling expenses should be incurred in Colombia or transferred to an offshore invoicer or an affiliated U.S. importer." *Id.* Commerce's decision to include U.S. selling expenses associated with U.S. sales in general expenses reflects a reasonable statutory interpretation and is in accordance with law.

■ However, Commerce's determination must also be supported by substantial evidence. Commerce failed to cite evidence to support the conclusion that expenses incurred on sales in the United States would be a reasonable surrogate for selling expenses incurred for home-market sales. "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Therefore, this issue is remanded to Commerce for reconsideration.

## IV.

### ALLOCATION OF COST OF PRODUCTION

#### *Plaintiff HOSA*

■ As noted above, in the preliminary results Commerce based the foreign market value for all respondents upon the constructed value of the subject merchandise. Preliminary Results, 60 Fed.Reg. at 30,270. "The constructed value represents the average per-flower cost for each type of flower, based on the costs incurred to produce that type of flower over each review period." *Id.* at 30,274. In this calculation, Commerce used the materials, fabrication, and general expenses reported by respondents.[21] *Id.* Commerce explained its methodology as follows:

used in the investigation and four previous administrative reviews, where the fact pattern remained unchanged and the error discovered in the methodology was of little significance). Asocolflores Brief at 28. Asocolflores' reliance on *Shikoku* is misplaced. The *Shikoku* court based its finding in part on the fact that the Department could not demonstrate that its new methodology was an improvement. Shikoku, 16 CIT at 386, 795 F.Supp. at 420. Here, by including all of the selling expenses associated with U.S. sales, Commerce ensured that its calculation of general expenses would remain unaffected by the arbitrary shifting of expenses between the exporter and the related U.S. importer.

In addition, the present case is also distinguishable because Asocolflores has not demonstrated actual reliance upon Commerce's prior methodology. The *Shikoku* court emphasized the importance of evidence on the record that plaintiffs had adjusted their prices in accordance with the methodology Commerce had consistently applied in the investigation and previous four reviews. *Shikoku,* 16 CIT at 388–89, 795 F.Supp. at 422. In contrast, here Asocolflores

has presented no evidence demonstrating that it actually relied upon Commerce's prior practice.

20. The court's review of an agency's change of position or practice will typically center on whether the action was arbitrary. A change is arbitrary if the factual findings underlying the reason for change are not supported by substantial evidence. Apart from factual findings, agency arbitrariness may also manifest itself in the particular reasoning offered by the agency; principally if the reasoning is inconsistent with the statutory mandate, or, to a lesser extent, if the reasoning (or lack thereof) violates general principles of administrative law, see, e.g., *Hussey Copper, Ltd. v. United States,* 17 CIT 993, 997, 834 F.Supp. 413, 418 (1993), or offends standards of procedural fairness implied in the statute. See, e.g., *Hussey Copper,* 18 CIT at 457–58, 852 F.Supp. at 1120.

21. In the course of its investigation, Commerce issued its standard section A (quantity and value data), B (home market sales), C (U.S. sales), and

The per-unit average constructed value was based on the quantity of export quality flowers sold by the grower/exporter to the United States. We consider non-export quality flowers (culls) which are produced in conjunction with export quality flowers to be by-products. Therefore, revenue from the sales of culls was used as an offset against the cost of producing the export quality flowers.

*Id.*

In the final determination, Commerce once again distinguished between export quality flowers and culls which it considered to be "reject" products. 61 Fed.Reg. at 42,851. Commerce again treated culls as by-products for cost accounting purposes and offset the total cost of production of export-quality flowers with revenues from the sales of culls. *Id.*

HOSA argues that Commerce erred by not allocating production costs to culls in the calculation of constructed value.[22] HOSA Mem. Supp. Mot. J. Agency R. at 5 [hereinafter HOSA Brief]. Specifically, HOSA maintains that Commerce did not allocate costs to culls because they are of a lower value and that Commerce does not have the legal authority to make this distinction. *Id.* Because costs were not allocated across all production, HOSA claims that the foreign market value of the subject merchandise is inappro-

priately high. *Id.* at 14. HOSA relies upon *IPSCO, Inc. v. United States*, 965 F.2d 1056 (Fed.Cir.1992) and *Thai Pineapple Public Co. v. United States*, 20 CIT ——, 946 F.Supp. 11 (1996), for the proposition that when two different grades of a single product are jointly produced each grade must be allocated separate costs of production notwithstanding value. HOSA Brief at 7, 11.

HOSA's reliance on *IPSCO* and *Thai Pineapple* is misguided. First, both IPSCO and Thai Pineapple involved the appropriate accounting treatment of co-products of the merchandise at issue. *See IPSCO*, 965 F.2d at 1060 (noting that Commerce treated limited service pipe "as a co-product, not as a by-product"); *Thai Pineapple*, 20 CIT at ——, 946 F.Supp. at 18, n. 5 ("No. party argued that juice is a by-product, such as pineapple waste. Thus, all parties agree that a co-product methodology for allocation of joint costs is necessary.").[23] Neither *IPSCO* nor *Thai Pineapple* addresses the issue presented in this case, the allocation of costs of unavoidable "reject" agricultural by-products for cost accounting purposes. In *IPSCO*, the Federal Circuit found that a value-based allocation of costs to co-products violated the antidumping statute. *IPSCO*, 965 F.2d at 1061 ("Essentially, the trial court ordered an unreasonable circular methodology. The selling price of pipe became a basis for measuring the fairness of the selling price of pipe.

D (constructed value) questionnaires to all respondents, including the HOSA Group ("HOSA"). Pub. Doc. No. 450, Def.'s Mem. Opp'n HOSA's Mem. Supp. Mot. J. Agency R., Ex. 7. [hereinafter Def.'s HOSA App.]. HOSA reported that its home market sales of miniature carnations (the only flowers it exported during the seventh review period) were "not done on a regular and consistent basis. Such sales are performed when [HOSA] is unable to sell such flowers in other countries at the desired prices and periods." HOSA Section A Response of May 16, 1994, Pub. Doc. No. 589, Def.'s HOSA App., Ex. 10.

In its section D response HOSA identified its miniature carnations as either "top quality" or "culls, non top quality." HOSA Section D Response of July 25, 1994, Pub. Doc. No. 834, Def.'s HOSA App., Ex. 11. "Top quality" flowers are those which meet standards for exportation to the United States and Europe and "culls" are those flowers which fail to meet such standards. *Id.*

During Commerce's verification of HOSA's responses the company stated that it had identified

its sales of subject flowers as either, "first quality" and "second quality" or "nacional." HOSA Group Verification Report, Pub. Doc. No. 1401, Def.'s HOSA App., Ex. 13. HOSA argued that Commerce should assign equal costs to flowers that the company graded as "second quality" because the company incurred the same costs producing "second quality" as "first quality" flowers. *Id.* However, HOSA presented Commerce with the same standards enumerated in its section D response (distinguishing "top quality" from "culls, non top quality") explaining that flowers failing to meet these standards are designated as "second quality." *Id.* at 10.

**22.** Plaintiff Asocolflores raises the identical issue. Asocolflores Brief at 29–35. The Court will treat both objections here.

**23.** See also *E.I. DuPont de Nemours & Co. v. United States*, 20 CIT ——, ——, 932 F.Supp. 296, 302 (1996) (noting that Commerce's determination that pellets are by-products is outside the scope of the co-product valuation rule of IPSCO as set out by the Federal Circuit).

This circular reasoning contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value."). *IPSCO* does not, however, as HOSA maintains, limit Commerce's discretion to use value to distinguish between by-products and co-products. Moreover, Commerce's approach here was not contrary to HOSA's reading of *IPSCO*. Commerce's treatment of culls as by-products was not based solely upon value. Commerce's determination was based primarily on the fact that there was no genuine (U.S. or home) market for culls. 61 Fed.Reg. at 42,851.

The broad terms of section 1677b(e) require inclusion within constructed value of all actual production costs of merchandise. See 19 U.S.C. § 1677b(e). The statute does not provide an explanation for treating production costs for products of a lower grade. The question presented, therefore, is whether Commerce's methodology for calculating constructed value is reasonable. *U.H.F.C. Co. v. United States*, 916 F.2d 689, 698 (Fed.Cir. 1990). The Court finds that Commerce's approach represents a permissible construction of the statute and a longstanding agency practice.[24]

Commerce uses the word "cull" as a surrogate for the term by product, an accounting concept for distinguishing which individual products may reasonably carry costs. 61 Fed.Reg. at 42,851. Commerce explains that "[c]ulls are not simply a low grade of flowers, but are unintentionally and unavoidably produced by-products that have minimal value."[25] *Id.* Based upon GAAP, Commerce's approach compares the value of the "specific product relative to the value of all products produced during, or as a result of the process of manufacturing the main product or products." *Id.* at 42,850. Commerce explains that its "general practice in cases involving agricultural goods has been to treat 'reject' products as by-products and to offset the total cost of production with revenues earned from the sale of any such 'reject' products." *Id.* This approach has been approved by this court. *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 13, 26, 704 F.Supp. 1114, 1125 (1989), aff'd, 901 F.2d 1089 (Fed.Cir.1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990)("[c]ull value ... should be deducted from cost of production and production costs should not be allocated to culls.").

HOSA alternatively claims if only co-products are properly allocated costs, its "second-quality" flowers are co-products. HOSA Brief at 16. HOSA's assertion, however, is belied by its own submissions. In the company's initial section D response, HOSA stated that it divides flowers into two distinct groups: (1) "top quality"; and (2) "culls." Pub. Doc. No. 834 at 21. HOSA stated that culls are "all flowers that do not meet with some of the characteristics mentioned above [qualifications for top quality status]." *Id.* At verification HOSA presented Commerce with the same list of characteristics, claiming that flowers which failed to meet one of these standards are designated "second quality." Pub. Doc. No. 1401 at 10. HOSA points to no evidence on the record demonstrating that HOSA's "second quality" flowers are distinguishable from culls. Accordingly, Com-

---

**24.** See e.g., Fresh Cut Roses From Colombia, 49 Fed.Reg. 30,765, 30,767 (Dep't Commerce 1984)(final det.)(calculating constructed value by allocating costs over export quality roses and treating non-export quality roses as by-products and adjusting costs to reflect sales of the by-products); Certain Fresh Cut Flowers From Peru, 52 Fed.Reg. 7,000, 7,003 (Dep't Commerce 1987)(final det.)(treating culls as by-products and offsetting the revenues from the sales of culls against the costs of the flowers); Certain Fresh Cut Flowers From Colombia, 52 Fed.Reg. 6,842, 6,844 (Dep't Commerce 1987)(final det.)("Part of the waste which occurs during production is comprised of the non-export quality flowers ('culls') which are produced in conjunction with the growth of the export quality flowers. These 'culls' were considered by the Department to be by-products. Therefore, the revenues from the sales of these culls were offset against the costs of the flowers.").

**25.** In cost accounting, the characteristic that generally distinguishes co-products from by-products, or scrap, is often the relative sales value of the product in question. By-products typically have a relatively minor sales value compared to that of the major products produced in the common manufacturing process. Charles T. Horngren & George Foster, *Cost Accounting, A Managerial Emphasis* 490 (5th ed.1982). This can be due to a small output or to low unit selling prices or to both. Wayne J. Morse & Harold P. Roth, *Cost Accounting* 157 (2d ed.1986).

merce properly determined that there was no reason to "treat what HOSA claims to be 'second quality' flowers sold in the home market any differently than we have treated culls." 61 Fed.Reg. at 42,851.

Finally, HOSA argues ·that Commerce erred in treating "second quality" flowers as culls because there is a genuine home market and U.S. market for "second quality" flowers. HOSA Brief at 14. But HOSA points to no record evidence demonstrating that it purposely produces "second quality" flowers for sale in Colombia. The sales revenue from HOSA's "second quality" flowers is negligible when compared to sales revenue from "first quality" flowers. See Def.'s HOSA App., Conf. Ex. 1. Commerce stated, "this market exists to the extent that HOSA, like many other Colombian flower producers, sells flowers it cannot export as surplus at the farm gate for whatever price it can get for the flowers."[26] 61 Fed.Reg. at 42,851. Commerce also found that HOSA's sales of "second quality" flowers in the · United States were made only during peak periods of demand when importers accept products of a lower quality. *Id.* This finding supports Commerce's conclusion that "the vast majority of 'second quality' flowers did not meet the minimum standards for sale in the United States, and that the majority of 'second quality' flowers were therefore culls." *Id.* Thus, the Court finds that Commerce's treatment of HOSA's "second quality" flowers as culls was supported by substantial evidence. Accordingly, Commerce's allocation of production costs was in accordance with law and was supported by substantial evidence.

## V.

### APPLICATION OF BEST INFORMATION AVAILABLE

#### A. *Plaintiff Flores del Rio*

█ In April 1994, Commerce transmitted questionnaires for the seventh review period. ·To assist in reporting the requested cost data, Commerce provided respondents with spreadsheets and instructions for reporting detailed costs on a line-by-line basis. Def.'s Mem. Opp'n Flores del Rio's Mem. Supp. Mot. J. Agency R., Ex. 1, at 70–75. In line 181, respondents were instructed to report depreciation of fixed overhead expenses. *Id.* at 72–73. In line 183, respondents were instructed to .report "other expenses," and provide a detailed explanation to describe the nature of the expense. *Id.* at 73. In line 214, they were asked to report any other general expenses not specifically identified. *Id.,* at 74.

As noted, in June 1995, Commerce issued a supplemental questionnaire that requested respondents to revise amortized pre-production costs to reflect the effects of inflation. Pub. Doc. No. 1508.

The Flores del Rio Group[27] ("Flores del Rio") filed two responses to the supplemental questionnaire. The first response contained inflation-adjusted depreciation expenses as well as "corrections to some errors"—also adjusted for inflation—that the company had found in its previously submitted depreciation data. Pub. Doc. No. 993, at 4, Flores del Rio App., Ex. 3. The second submission included non-inflation-adjusted data upon which the alleged errors had been corrected. Pub. Doc. No. 1016, Flores del Rio App., Ex. 4. Flores del Rio explained, "in the event the Department decides that constructed value should be calculated without inflation adjustments, the enclosed tables should be used as the basis for del Rio's CV." *Id.*

Commerce rejected Flores del Rio's corrections. The Department applied its own inflation adjustment based upon the Colombian government's percent annual inflation rate ("PAAG"), to Flores del Rio's original sub-

---

**26.** HOSA admitted this fact. In its section A response, HOSA stated, "[o]ur home market demand does not affect our production decisions. Most of our production decisions in terms of volumes, periods, varieties, and colors are all geared to fulfill the U.S. market's demand since it is our biggest market." Def.'s HOSA App., Ex. 10 at 13.

**27.** Plaintiff Flores del Rio is a producer and exporter of subject flowers and comprises three farms: Agricola Cardenal S.A., Flores del Rio S.A., and Indigo S.A. 61 Fed.Reg. at 42,867–68.

missions as the best information available ("BIA"). 61 Fed.Reg. at 42,837. Commerce calculated two separate rates—a rate for depreciation of fixed assets and a rate for preproduction costs. See Pub. Doc. No. 1721, at 1, Def.'s Mem. Opp'n Flores del Rio's Mem. Supp. Mot. J. Agency R., Ex. 3. Commerce applied a BIA inflation rate of 46.41 percent to Flores del Rio for fixed asset depreciation and a BIA inflation rate of 21.24 percent to Flores del Rio for pre-production amortization. *Id.* at 4. Flores del Rio challenges Commerce's application of BIA, arguing that the Department's resort to BIA was not in accordance with law. Flores del Rio Mem. Supp. Mot. J. Agency R. at 6 [hereinafter Flores del Rio Brief].

Commerce's authority to use BIA in an administrative review of an antidumping duty order resides in 19 U.S.C. § 1677e. According to the statute, "[i]n making their determinations ... the administering authority ... shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." 19 U.S.C. § 1677e(c). Commerce's regulations implement this mandate by authorizing the use of BIA whenever the agency "[d]oes not receive a complete, accurate and timely response to the Secretary's request for information" or "[i]s unable to verify, within the time specified, the accuracy and completeness of the factual information submitted." 19 C.F.R. § 353.37(a).

Commerce must "fairly request" the data prior to resorting to any secondary information. See *Koyo Seiko Co. v. United States,* 92 F.3d 1162, 1165 (Fed.Cir.1996). Once Commerce has done so, it possesses the "discretion to determine whether a respondent has complied with an information request." *Daido Corp. v. United States,* 19 CIT 853, 861, 893 F.Supp. 43, 49–50 (1995)(citing S.Rep. No. 249 at 98 (1979); H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979)). Here, the supplemental questionnaire clearly requested inflation adjustments to previously reported depreciation expenses. See Pub. Doc. No. 1508, Def.'s Mem. Opp'n Flores del Rio's Mem. Supp. Mot. J. Agency R., Ex. 2

("revise these expenses so that they are based on asset values, which, in accordance with Colombian GAAP, have been adjusted to reflect the effects of inflation...."). Thus, Commerce "fairly" requested the inflation adjustments. The remaining question is whether Flores del Rio properly responded to the request.

Flores del Rio contends that it fully complied with Commerce's request for information, therefore, the Department erred in resorting to BIA. Flores del Rio Brief at 7. Flores del Rio cites *Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565 (Fed.Cir. 1990), *Floral Trade Council v. United States,* 15 CIT 497, 775 F.Supp. 1492, (1991), aff'd 67 F.3d 318 (Fed.Cir.1995), and *Queen's Flowers de Colombia v. United States,* 20 CIT ——, 947 F.Supp. 503 (1996), to support this argument.

Flores del Rio's reliance here is misguided because the cases cited do not diminish Commerce's authority to resort to BIA when a proper request for information is made and the appropriate information is not provided. In Olympic Adhesives, the court found that use of BIA was not justified because the respondent gave full and complete answers to Commerce's questionnaire even though the answers did not "definitely resolve the overall issue presented." *Olympic Adhesives,* 899 F.2d at 1574. In Floral Trade Council, the court held that Commerce's resort to BIA, based on respondent's failure to provide cost data, was improper because the Department had not in fact requested cost data in addition to price data. *Floral Trade Council,* 15 CIT at 502, 775 F.Supp. at 1498. Similarly, in Queen's Flowers, this Court rejected Commerce's resort to BIA where the information sought was never requested. *Queen's Flowers,* 20 CIT at ——, 947 F.Supp. at 507.

Flores del Rio also argues that Commerce erred in resorting to BIA because the Department was required to accept the company's correction of clerical errors. Flores del Rio Brief at 8. Specifically, Flores del Rio maintains "there is no requirement in [Commerce's] regulations or questionnaires that corrections to data previously submitted be explained or accompanied by any further 'ev-

idence,'" therefore, Commerce was required to accept Flores del Rio's corrections. *Id.* at 10. The antidumping statute provides that "[t]he administering authority shall establish procedures for the correction of ministerial errors in final determinations...." See 19 U.S.C. § 1675(f). As used in section 1675(f) "the term 'ministerial error' includes ... clerical errors...." *Id.*

Flores del Rio maintains that under *NTN Bearing Corp. v. United States,* 74 F.3d 1204 (Fed.Cir.1995), Commerce was required to accept Flores del Rio's request to correct clerical errors and to recalculate the antidumping margin on the basis of its corrected data.[28] Flores del Rio brief at 8. But the NTN Bearing court only required Commerce to accept a party's request to correct clerical errors when the party submitted supporting documentation to establish the clerical nature of the errors.[29] *NTN Bearing,* 74 F.3d at 1208. Here, except for one sentence in Flores del Rio's response which merely stated that the company was "also correcting some errors [that we] found in [our] previously submitted depreciations," Flores del Rio provided neither an explanation nor any documentation which might have established the "clerical" nature of the changes. Flores del Rio App., Ex. 3, at 4. Further, without accompanying documentation Commerce could not determine whether the corrected data was accurate.[30] Non–Pub. Doc. No. 1124, at 2–3 (Commerce Analysis Memorandum for Flores del Rio, Aug. 1, 1996). Commerce's use of the best information available in this case was appropriate.

■ Commerce's choice of BIA also must be supported by substantial evidence. The BIA inflation adjustments for Flores del Rio were made using rates calculated by Commerce's Office of Accounting. *Id.* As noted previously, two separate rates were used—a rate for depreciation of fixed assets and a rate for pre-production costs—and the rates were based upon the PAAG rates. See Pub. Doc. No. 1721, at 1, Def.'s Mem. Opp'n Flores del Rio's Mem. Supp. Mot. J. Agency R., Ex. 3.

Commerce's decision was supported by substantial evidence. The data chosen was contemporaneous with the periods of review. The data was based upon published Colombian inflation rates, clearly appropriate in the context of making inflation adjustments to the reported expenses of the Colombian company. *D & L Supply Co. v. United States,* 113 F.3d 1220, 1223 (Fed.Cir.1997) (finding Commerce's discretion in choosing BIA is limited only by the requirement that a rational relationship exist between the data chosen and the matter to which it is to apply). By definition Colombian inflation rates bear a rational relationship to a Colombian company. Thus, Commerce's choice of BIA based on the Colombian PAAG was appropriate.

Flores del Rio also argues that Commerce "takes issue only with the depreciation base upon which the company calculated its inflation adjustments," therefore, Commerce's use of BIA should be limited to the change in the base, not to the company's entire reported cost. Flores del Rio Brief at 12. Flores

---

28. Flores del Rio also argues that Commerce did not return the revised information that the Department rejected in accordance with 19 C.F.R. § 353.31(b)(2). Flores del Rio Brief at 9–10. But even if Commerce had complied with the regulation the outcome here would remain the same. Because Flores del Rio was not prejudiced by Commerce's failure to return the revised information, the Court finds Commerce's error was harmless. See *Sea–Land Serv., Inc. v. United States,* 14 CIT 253, 257, 735 F.Supp. 1059, 1063 (1990)("[I]t is ... well settled that courts will not set aside agency action for procedural errors unless the errors 'were prejudicial to the party seeking to have the action declared invalid.'"), *aff'd,* 923 F.2d 838 (Fed.Cir.1991).

29. Flores del Rio also argues that its situation was one of a "catch 22." Flores del Rio Brief at

8. Specifically, Flores del Rio maintains that Commerce's "own regulations precluded Rio from knowingly re-submitting incorrect data," yet, the company's corrections were rejected by Commerce. *Id.; see* 19 C.F.R. § 353.31(1)(i). But Flores del Rio could have avoided this situation by submitting an explanation and supporting documentation with its revised data.

30. The antidumping statute requires Commerce to verify all information relied upon. *See* 19 U.S.C. 1677e(b); 19 C.F.R. 353.36(a). If the Department is unable to verify the accuracy of the factual information submitted, Commerce may resort to "best information available." *See* 19 U.S.C. § 1677e(b); 19 C.F.R. § 353.37(a)(2).

del Rio maintains that this approach would be more accurate and avoid grossly overstating costs. *Id.* But the adjustment suggested by Flores del Rio is based upon the unsolicited information which Commerce rejected. Because Commerce appropriately rejected this information as being unexplained and not supported by evidence, the Department was also reasonable in not relying upon this information for purposes of its BIA inflation adjustments.[31]

 Finally, Flores del Rio argues that Commerce resorted to BIA without providing any notice to the company or any opportunity to comment, and that therefore, Commerce's resort to BIA was procedurally unfair. Flores del Rio Brief at 7. The statute, however, does not require Commerce to notify or provide a respondent with opportunity to comment before Commerce applies BIA. See 19 U.S.C. § 1677e(c). As the statute is silent regarding this issue, the Court must decide only whether Commerce's construction is permissible. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

This court has recognized that "Commerce is not required to afford interested parties an unlimited opportunity to comment on each modification of the agency's practice or procedure. To provide otherwise would be to unnecessarily burden the agency with an unending cycle of notices, comments, and responses." *British Steel plc v. United States,* 19 CIT 176, 255, 879 F.Supp. 1254, 1317 (1995), *aff'd in part, rev'd on other grounds,* 127 F.3d 1471 (Fed.Cir.1997). The BIA provisions were among the "administrative reforms" enacted by Congress in the Trade Agreements Act of 1979, Pub.L. No. 96–39, in an effort to reduce the length of antidumping investigations, which was often attributable to delays in the assessment and collection of data. See H.R.Rep. No. 317, 96th Cong., 1st Sess. at 24 (1979). In the present case, Commerce requested inflation adjusted data and Commerce warned that any deficient response would result in Commerce's resort to BIA. The Court finds that Commerce's approach was permissible.

Flores del Rio argues that under *British Steel,* 19 CIT 176, 879 F.Supp. 1254, *Sigma Corp. v. United States,* 17 CIT 1288, 841 F.Supp. 1255 (1993), and *Lois Jeans & Jackets, U.S.A., Inc. v. United States,* 5 CIT 238, 566 F.Supp. 1523 (1983), Commerce's failure to provide the company an opportunity to comment constitutes reversible error. Flores del Rio Brief at 7. The Court does not agree.

In *British Steel,* the court remanded Commerce's decision because Commerce's determination represented a change in policy that interested parties had not been notified about or given an opportunity to comment upon. *British Steel,* 19 CIT at 255–56, 879 F.Supp. at 1317 (holding Commerce erred in shifting from applying a company-specific margin in its preliminary results to a country-wide margin in the final determination without informing interested parties). In contrast, in the present case Commerce asked respondents to submit inflation adjustments. Moreover, Commerce warned respondents "[u]pon receipt of a response that is incomplete or deficient to the extent the Department determines it to be nonresponsive, the Department will not issue additional supplemental questionnaires but will use the best information available." Pub. Doc. No. 1508, Def.'s Mem. Opp'n Flores del Rio's Mem. Supp. Mot. J. Agency R., Ex. 2, at 2.

The *Sigma Corp.* court found that Commerce had erred by not providing notice and an opportunity to comment when the preliminary results failed to mention that Commerce was contemplating a country-wide rate for all exporters. *Sigma Corp.,* 17 CIT at 1303, 841 F.Supp. at 1267. In contrast, Commerce requested inflation adjustments from Flores del Rio and warned the company that failure to respond would result in the application of BIA.

In *Lois Jeans & Jackets* the court held that the determination had been made without compliance by the Customs Service with

---

**31.** Although the depreciation line (item 214) included expenses other than depreciation expenses, Commerce made an upward adjustment of 46.41 percent to all of Flores del Rio's listed expenses because the company's response did not contain a breakdown of this item. Flores del Rio App., Ex. 5, at 3.

its regulations concerning notice and an opportunity for comment. *Lois Jeans & Jackets,* 5 CIT at 242, 566 F.Supp. at 1527. In contrast, in the present case Commerce proceeded, as the regulations require, by allowing the parties an opportunity to file case briefs commenting on the preliminary results. See 19 C.F.R. § 353.38(C). Accordingly, the Court finds that Commerce's application of BIA to Flores del Rio was in accordance with law and was supported by substantial evidence.

## B. *Plaintiff Eden Floral Farms*

 On November 9, 1993, Commerce sent section A of its antidumping questionnaire to Groex, S.A. ("Groex"). Pub. Doc. No. 120, Def.'s Mem. Opp'n Eden Floral Farms' Mem. Supp. Mot. J. Agency R., Ex. 1, at 2. Groex submitted its section A responses to Commerce on November 25, 1993 stating in each submission that, "[w]e do not have internal financial statements, for the subject merchandise. We use an auxiliary journal book to determine constructed value. This book will be included when we send information for section C." Pub. Doc. No. 142, Def.'s Mem. Opp'n to Eden Floral Farms' Mem. Supp. Mot. J. Agency R., Ex. 3. Groex submitted no further data for the fifth and sixth reviews.

In response to section A of Commerce's questionnaire for the seventh review period, Groex submitted certification, dated May 8, 1994, stating that the company did not produce or export any subject flowers to the United States or any third countries. Pub. Doc. No. 554, Def.'s Mem. Opp'n Eden Floral Farms' Mem. Supp. Mot. J. Agency R., Ex. 4.

In the preliminary results, Commerce included Groex on the list of respondents found to have "refused to cooperate with the Department or otherwise significantly impeded the proceeding," and assigned Groex the first-tier BIA rate, 75.92 percent, for the fifth review, and the first-tier BIA rate, 83.61 percent, for the sixth review. *Preliminary Results,* 60 Fed.Reg. at 30,272. Because Groex had no exports to the United States during the seventh review, Commerce terminated its investigation of the company during that period. Pub. Doc. No. 1337, Def.'s Mem. Opp'n Eden Floral Farms' Mem. Supp. Mot. J. Agency R., Ex. 7, at 2.

In August, 1995, Eden Floral Farms[32] ("Eden") submitted a case brief contesting Commerce's assignment of a "punitive, noncooperative" BIA margin to Groex. Pub. Doc. No. 1693, Def.'s Mem. Opp'n Eden Floral Farms' Mem. Supp. Mot. J. Agency R., Ex. 10, at 1. Eden stated that the shareholders of Groex had resolved to liquidate Groex on May 2, 1994, two months before Groex's responses to sections C and D of Commerce's questionnaire were due, and argued therefore that Groex was unable to comply with Commerce's information requests. Eden's Mem. Supp. Mot. J. Agency R. at 3–4 [hereinafter Eden Brief]. Commerce rejected Eden's argument and in the final determination again assigned the first-tier BIA rate, 76.60 percent, to Groex. 61 Fed.Reg. at 42,863.

 In the final determination, Commerce applied the two-tier BIA scheme approved by the Federal Circuit in *Allied-Signal*[33] to select a first-tier or "uncooperative" total BIA rate.[34] 61 Fed.Reg. at 42,835.

---

32. In January 1993, Eden Floral Farms (a small importer of cut flowers from Colombia based in Miami, Florida) purchased A & S Flower Exchange (also a small importer of cut flowers from Colombia). A & S imported cut flowers subject to these reviews from Groex, S.A., an unrelated Colombian producer. Pub. Doc. No. 1693, Def.'s Mem. Opp'n Eden Floral Farms' Mem. Supp. Mot. J. Agency R., Ex. 10 at 1. As the importer of record, Eden is required to pay antidumping duties at the rate established by Commerce.

33. In Allied–Signal the court approved a total BIA scheme in which the ITA selects first-tier BIA when a respondent refuses to cooperate with its requests for information or significantly impedes the administrative review, and second-tier BIA, which is less adverse, when a respondent substantially cooperates but still fails to provide requested information in a timely manner or in the required form. *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1190–91 (Fed. Cir.1993).

34. Under Commerce's BIA methodology, there are two general types of BIA: "total BIA" and "partial BIA." *National Steel Corp.v. United States,* 18 CIT 1126, 1131, 870 F.Supp. 1130, 1135 (1994); *Rhone Poulenc, Inc. v. United States,* 13 CIT 218, 224, 710 F.Supp. 341, 346 (1989), *aff'd,* 899 F.2d 1185 (Fed.Cir.1990). The distinction between total and partial BIA is ex-

Commerce assigned the first-tier BIA rate to Groex stating that the company failed to submit responses to sections C and D of the Department's questionnaire or "explain why it was unable to do so in a timely fashion." *Id.* at 42,863. Eden maintains that the company informed Commerce why Groex had been unable to submit a response and points to documentation submitted to the Department regarding the liquidation of Groex. See Eden Non–Pub. App., Ex. 3. However, Commerce was advised of Groex's sale only after the publication of the preliminary results, in August 1995, when Eden filed its case brief. See Def.'s Mem. Opp'n Eden Floral Farms' Mot. J. Agency R., Ex. 10. This was after the deadline for the submission of new factual information. 19 C.F.R. § 353.31(a)(1)(ii). Accordingly, Commerce appropriately rejected Groex's submission as untimely and used BIA. 19 U.S.C. § 1677e(c). However, in order for Commerce to apply the first-tier BIA rate to the respondent, the Department must produce substantial evidence that the party refused to cooperate or significantly impeded its review. See 19 U.S.C. § 1516a(b)(1)(B). In the final determination here, Commerce assigned Groex a non-cooperative BIA rate, stating that the company had failed to submit a response to sections C and D of the Department's questionnaire or explain why it was unable to do so in a timely manner. 61 Fed.Reg. at 42,863. Eden argues that the "special circumstances" surrounding Groex's failure to submit its responses precluded Commerce from concluding that the company refused to cooperate.[35] Eden Brief at 8. Eden attempts to support its argument by references to other producers in the present proceeding to whom

Commerce declined to apply a non-cooperative BIA rate. *Id.* at 8–10.

First, Eden points to Commerce's decision to apply a second tier BIA rate to another respondent Flores Estrella when it failed to respond to Commerce's questionnaire in the fourth administrative review. Certain Fresh Cut Flowers From Colombia, 59 Fed.Reg. 15,159, 15,174 (Dep't Commerce 1994)(final det.). Commerce concluded that Flores Estrella was subject to financial and personnel restraints at the time it received the Department's questionnaire and therefore was justified in failing to respond. *Id.* The facts surrounding Commerce's finding with regard to Flores Estrella clearly are distinguishable from those presented here. When Flores Estrella received Commerce's questionnaire, the company advised the Department of its financial difficulties and offered to provide as much information as possible. *Id.* In contrast, Groex did not notify Commerce of any difficulties when it received the Department's information request.

Second, Eden cites Commerce's decision in the case of the Colombian flower grower My Flowers. Eden Brief at 9. Commerce treated My Flowers as "unlocatable" because the company demonstrated that it did not receive Commerce's information requests. 61 Fed. Reg. at 42,862. Commerce instructed Customs to liquidate its entries at the "all others rate" of 3.10 percent. *Id.* Eden argues that the same reasoning applies to Groex because Groex was liquidated prior to the time that the section C and D responses were due. Eden Brief at 10. Groex, however, unlike My Flowers was fully aware of its reporting requirements. Groex attended Commerce's seminar in Bogota, received the questionnaires, hired an accounting firm to help it

---

plained in *Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 18 CIT 906, 915 n. 21, 865 F.Supp. 857, 865 n. 21 (1994), *aff'd*, 68 F.3d 487 (Fed.Cir. 1995), as follows: "Commerce uses 'total BIA' for a respondent whose reporting or verification failure is so extensive as to make its entire response unreliable.... Commerce applies 'partial BIA' when a respondent's submitted information is deficient in limited respects, yet is still reliable in most other respects."

**35.** Eden also argues that Commerce's application of the first-tier BIA rate to Groex was puni-

tive and thus was not in accordance with law. Eden Brief at 5. But "[i]n order for the agency's application of the best information rule to be properly characterized as 'punitive,' the agency would have had to reject low margin information in favor of high margin information that was demonstrably less probative of current conditions". *Rhone Poulenc*, 899 F.2d at 1190. Here, Commerce did not reject low margin information in favor of high margin information that was less probative. Commerce simply had no information to calculate margins for Groex for the fifth and sixth administrative reviews.

prepare questionnaire responses, and submitted to Commerce both its section A responses for the fifth and sixth review periods and a no-shipment certification for the seventh review. *See* Pub. Docs. No. 554, 1693, Def.'s Mem. Opp'n Eden Floral Farms' Mem. Supp. Mot. J. Agency R., Ex. 4, Ex. 10 at 3.

Finally, Eden points to Commerce's application of the second-tier BIA rate to flower growers that were no longer in business, 61 Fed.Reg. at 42,836, arguing that this treatment is inconsistent with Commerce's treatment of Groex. But Commerce found that the other producers were never in a position to process Commerce's information requests. *Id.* Groex, however, was still in business when it received Commerce's questionnaires.

The Court finds that there is sufficient evidence on the record demonstrating Groex's refusal to cooperate. Accordingly, Commerce's application of first-tier BIA to Groex was in accordance with law and was supported by substantial evidence.

### C. *Plaintiff Equiflor*

▮▮▮ Commerce sent a questionnaire covering the fifth and sixth reviews to Sunset Farms ("Sunset") on April 13, 1994 and a questionnaire covering the seventh review to Flores el Majui ("Majui") on May 5, 1994. Pub. Doc. No. 1821, Def.'s Mem. Opp'n Equiflor's Mem. Supp. Mot. J. Agency R., Ex. 12. In the preliminary results, Commerce assigned first-tier BIA to both Majui and Sunset stating that they "failed to respond to our requests for information." *Preliminary Results*, 60 Fed.Reg. at 30,272.

On August 11, 1995, Equiflor and Espirit Miami [36] (collectively "Equiflor") filed a case brief in the administrative review of the present proceeding. Pub. Doc. No. 1692, Def.'s Mem. Opp'n Equiflor's Mem Supp. Mot. J. Agency R., Ex. 9. Equiflor maintained that Majui could not have received Commerce's questionnaire since it had gone out of business.[37] *Id.* at 2. Equiflor also argued that Sunset was experiencing financial and personnel difficulties, therefore, Commerce should have declined to apply first-tier BIA to the company. *Id.* at 5.

In the final determination, Commerce did not alter its decision and once again applied first-tier BIA to both Majui and Sunset. 61 Fed.Reg. at 42,862–63. Equiflor argues that Commerce should not have assigned a non-cooperative BIA rate to Majui because the company no longer existed on May 5, 1994, when Commerce's questionnaire in the seventh review (the only review involving Majui) was sent out; therefore, Majui never received the questionnaire. Equiflor's Mem. Supp. Mot. J. Agency R. at 3 [hereinafter Equiflor Brief]. The record shows, however, that Majui did receive the questionnaire.[38] *See* Def.'s Mem. Opp'n Equiflor's Mot. J. Agency R., Ex. 12. Because substantial evidence exists to show that Majui received Commerce's questionnaire and did not respond, Commerce's application of first-tier BIA to Majui was appropriate.

Equiflor also argues that Commerce erred in treating Sunset Farms differently than Flores Estrella. Equiflor Brief at 9–10. As noted earlier, Flores Estrella advised Commerce of its financial difficulties and offered to cooperate with Commerce in submitting the information requested. In contrast, Sunset Farms did not notify Commerce of any

---

36. Equiflor and Espirit Miami are both importers of cut flowers from Colombia based in Miami, Florida. Equiflor's Mem. Supp. Mot. J. Agency R. at 3 [hereinafter Equiflor Brief]. Both imported cut flowers subject to these reviews from Sunset Farms. Equiflor Non–Pub. App., Ex. 2. Equiflor also imported flowers subject to these reviews from Flores el Majui. *Id.* As the importers of record, they are required to pay antidumping duties at the rates established by the Department.

37. Flores el Majui sold its assets to an unrelated company called Calima on July 15, 1993. Equiflor Non–Pub. App., Ex. 1. On August 31, 1993, the company was legally dissolved. *Id.* Ex. 3.

38. Equiflor suggests that Majui never received Commerce's questionnaire because the courier TNT Skypack International Express could not obtain the signatures of the recipients of Commerce's questionnaire. Pub. Doc. No.1921, Def.'s Mem. Opp'n Equiflor's Mem. Supp. Mot. J. Agency R., Ex. 12. Receipt of the questionnaire in May, 1994, was acknowledged with a company stamp. *Id.* Equiflor ignores the fact that Commerce also sent a copy of the questionnaire via Federal Express in August, 1994. Receipt of the questionnaire sent via Federal Express on August 11, 1994, was acknowledged with a signature. *Id.*

reason for its failure to respond to Commerce's questionnaire. Thus, Commerce's decision to apply a non-cooperative BIA rate to Sunset Farms was consistent with its Flores Estrella decision. The record shows simply that Commerce sent a questionnaire to Sunset Farms and the company did not respond. Accordingly, Commerce's application of first-tier BIA to Sunset Farms was appropriate.

### D. *Plaintiff Floralex*

■ During the administrative reviews of the present proceeding, Commerce conducted verification of a cross-section of the respondents who had answered Commerce's information requests, including Floralex, Ltda. 61 Fed.Reg. at 42,836. Commerce's verification team conducted an on-site sales and cost verification in September 1994 and issued a report of its findings in November 1994. Pub. Doc. No. 1288, Def.'s Mem. Opp'n Floralex's Mem. Supp. Mot. J. Agency R., Ex. 6.

Commerce summarized the verification conclusions in the preliminary results, stating "[w]e encountered serious verification problems with respect to" Floralex, and "were unable to verify the accuracy of the constructed value information submitted by this firm." Preliminary Results, 60 Fed.Reg. at 30,273. At the same time, because Commerce found that Floralex had submitted responses and otherwise participated in all segments of the investigation, Commerce determined that the company had substantially cooperated with its request for information and applied a second-tier BIA rate to Floralex for all three reviews. *Id.*

In August 1995, Floralex submitted a reply brief[39] in response to another petitioner's contention that companies such as Floralex, which had encountered problems at verification, should be assigned a first-tier BIA rate. Pub. Doc. No. 1704, Def.'s Mem. Opp'n Floralex's Mem. Supp. Mot. J. Agency R., Ex. 11. Floralex successfully argued that Com-

merce appropriately had applied the first-tier/second-tier distinction and concluded that "[t]he Department was clearly correct in applying 'second-tier' BIA to the companies that cooperated in the investigation but failed verification, and Petitioner's assertion to the contrary should be rejected." *Id.* at 4.

In the final determination, Commerce did not alter its assignment of second-tier BIA to Floralex, emphasizing again the "serious difficulties" it had encountered in "attempting to verify the responses submitted by ... Floralex." 61 Fed.Reg. at 42,836.

Before this Court Floralex argues that because the company passed its sales verification, Commerce should have accepted its sales information and used partial BIA only for its costs. Floralex's Mem. Supp. Mot. J. Agency R. at 4. Commerce correctly responds that Floralex failed to exhaust its administrative remedies. Def.'s Mem. Opp'n to Floralex's Mem. Supp. Mot. J. Agency R. at 36.

■ At the administrative level, Floralex successfully argued that Commerce should apply a second-tier BIA rate because the company failed verification. Floralex never raised a total versus partial BIA argument. It is a well-settled principle of administrative law that "[a] reviewing court usurps the agency's function when it sets aside an agency determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Timken Co. v. United States,* 16 CIT 429, 434, 795 F.Supp. 438, 442 (1992) (quoting *Unemployment Compensation Comm'n of Alaska v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946)). Accordingly, the Court will not address Floralex's argument.

### E. *Plaintiff Florex*[40]

■ In August 1994, Commerce issued a supplemental questionnaire to Santa Helena,

---

39. Commerce regulations provide for the submission of a case brief after the date of publication of the preliminary results, and of a rebuttal brief after the filing of the case brief. *See* 19 C.F.R. § 353.38(c),(d).

40. Plaintiff Florex includes five Colombian flower-producing companies, Flores de Exportacion S.A., Agricola Guacari S.A., Flores Altamira S.A., Santa Helena S.A., and Flores del Salitre Ltda., a Colombian cuttings producer, S.B. Talee de Colombia Ltda., and a related U.S. importer, Four

noting that it had received the company's response to Commerce's original questionnaire and found that additional clarification was needed. *See* Florex App., Non–Pub. Ex. 21 ("Supplemental Questionnaire"). In addition to other deficiencies, Commerce stated:

> The optional Crop Adjustment Method which you have used may not be reported correctly. This item was not explained in your response. Please provide a detailed narrative description of the methodology that you have used. Note that the following methodology should be employed in reporting for this item. Please check your response and resubmit where necessary.

*Id.* ¶ 17.

In December 1994, Commerce issued its preliminary analysis memorandum for Florex, stating:

> Santa Helena and Flores de Salitre, improperly reported the crop adjustment methodology. Specifically, Santa Helena's narrative description of the expenses included and the methodology utilized to amortize these expenses was inconsistent with the numbers provided. When asked to correct this situation, the company failed to do so. Furthermore, the narrative explanation provided was inconsistent with the amounts presented in the various categories. Unable to correct the methodology based on the information on the record, we therefore applied a cooperative BIA rate to their sales.

Florex App., Non–Pub. Ex. 7 ("Florex Group Preliminary Analysis Memorandum").

In the preliminary results, Commerce found that although Santa Helena submitted responses to its supplemental questionnaire, the company had failed to provide information allowing Commerce to correct serious deficiencies in their cost data responses. *Preliminary Results*, 60 Fed.Reg. at 30,273. Because Commerce was unable to use Santa Helena's cost data for comparison purposes, it applied total BIA for sales made by the company. *Id.* However, because the company had substantially cooperated with Commerce's requests for information, the Department preliminarily applied a second-tier BIA margin to sales made by the company. *Id.*

In June 1995, Commerce issued another supplemental questionnaire to certain respondents, including the Florex Group, asking them to revalue depreciation and/or amortization expenses to reflect the effects of inflation. Florex App., Ex. 8 ("Inflation Adjustment Questionnaire"). On July 21, 1995, the Florex Group responded to Commerce's inflation adjustment questionnaire. *Id.* Non–Pub. Ex. 10. In this response, Santa Helena also corrected the preexisting errors in its crop adjustment calculations. *Id.* In the final determination, Commerce reiterated its preliminary result findings and again applied the second-tier BIA rate to sales made by Santa Helena. 61 Fed.Reg. at 42,857.

Florex challenges Commerce's application of BIA to Santa Helena, arguing that the resort to BIA was not in accordance with law. Florex Brief at 14. More specifically, Florex alleges that Commerce's instructions pertaining to the crop adjustment methodology "were unclear and inadequate." *Id.* at 25. The Court does not agree. Commerce outlined the optional crop adjustment method and requested a detailed narrative description of the methodology used. See Florex App., Non–Pub. Ex. 21. Moreover, if Santa Helena did not understand the questionnaire, it had the opportunity and the responsibility to seek clarification from Commerce. *Id.* ("If you have any questions, please contact Michael Panfeld at . . . ."); see Antifriction Bearing (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al., 57 Fed.Reg. 28,360, 28,382 (Dep't Commerce 1992)(final det.) ("If a respondent found the requirements to be unclear, then the burden is on the respondent to ask the Department for guidance."), aff'd, *Emerson Power Transmission Corp. v. United States*, 19 CIT 1154, 1161, 903 F.Supp. 48, 55 (1995). Accordingly, Commerce "fairly requested" the data.

■ As noted, once Commerce has "fairly requested" the data, it possesses the "discre-

Farmers Inc., (collectively the "Florex Group"). Plaintiff Florex adopts all the arguments presented by plaintiff Asocolflores discussed previously.

Florex's Mem. Supp. Mot. J. Agency R. at 2 [hereinafter Florex Brief].

tion to determine whether a respondent has complied with an information request." [41] *Daido Corp.*, 19 CIT at 861, 893 F.Supp. at 49–50. Here, Commerce appropriately rejected Santa Helena's corrections as "untimely," 61 Fed.Reg. at 42,856, because they were submitted after the preliminary results.[42] 19 C.F.R. § 353.31(a)(1)(ii).

Florex argues that Commerce unlawfully resorted to BIA after Santa Helena had submitted corrections to its errors.[43] Florex Brief at 15. Specifically, Florex maintains that the deficiencies which existed prior to the preliminary results "were corrected in Santa Helena's subsequent supplemental response—submitted at [Commerce's] request—after the preliminary results." *Id.* Commerce responds that the Inflation Adjustment Questionnaire was not issued to Santa Helena, therefore, Santa Helena's unsolicited corrections were appropriately rejected. Def.'s Mem. Opp'n Florex's Mot. J. Agency R. at 23. Commerce was not requesting corrections to previously submitted data. The questionnaire stated, "[i]f you have reported amortized pre-production costs ... revise these expenses so that they are based on asset values ... adjusted to reflect the effects of inflation...." Florex App., Ex. 8. It was clear from the supplemental questionnaire that Commerce sought inflation adjustments to originally submitted information, not entirely new data. Thus, Santa Helena's unsolicited and untimely corrections were appropriately rejected by Commerce. Accordingly, Commerce's resort to BIA was in accordance with law.

■ Florex also argues Commerce's application of total BIA was not supported by substantial evidence. Florex Brief at 24. Specifically, Florex maintains that Commerce should have used partial BIA for Santa Helena's erroneous preproduction amortization calculations. *Id.*

As noted previously, the distinction between total and partial BIA is explained in *Ad Hoc Committee*, 18 CIT at 915 n. 21, 865 F.Supp. at 865 n. 21, as follows: "Commerce uses 'total BIA' for a respondent whose reporting or verification failure is so extensive as to make its entire response unreliable.... Commerce applies 'partial BIA' when a respondent's submitted information is deficient in limited respects, yet is still reliable in most other respects."

Here, Santa Helena improperly reported its crop adjustment methodology. Specifically, the company's description of the expenses included and the methodology utilized to amortize these expenses was inconsistent with the numbers provided. Florex App., Non–Pub. Ex. 7, at 2. Further, the narrative explanation provided by Santa Helena was inconsistent with the amounts presented in the various categories. *Id.* Commerce stated that Santa Helena's improper reporting was a serious deficiency rendering the Department unable to use the company's cost data for comparison purposes. *Preliminary Results*, 60 Fed.Reg. at 30,273. However, Commerce failed to cite evidence demonstrating that Santa Helena's improper crop amortization made its entire response unreliable. Accordingly, the Court remands this issue to Commerce for further consideration. Upon remand, Commerce must consider its choice of BIA and explain to the Court the findings supporting its decision.

**41.** Florex also argues that Commerce had to accept Santa Helena's submission because Commerce failed to return the corrected information in accordance with 19 C.F.R. § 353.31(b)(2), Florex Brief at 17. However, Commerce's failure to comply with this regulation constituted harmless error. *See supra note 28.*

**42.** Florex also argues that Commerce's application of BIA to Santa Helena based upon the conduct of a related party S.B. Talee was not in accordance with law. Florex Brief at 21. Commerce, however, appropriately resorted to BIA on the sole basis of Santa Helena's untimely submission of corrections. Thus, Commerce's reliance upon the conduct of S.B. Talee is besides the point.

**43.** Florex also argues that Commerce improperly relied upon diskette problems in support of its decision to use BIA. Florex Brief at 18. However, while the final determination, 61 Fed.Reg. at 42,857, states that Commerce notified Santa Helena of certain diskette problems prior to the issuance of the preliminary results, Commerce did not rely upon these problems in the final determination for purposes of BIA.

## VI.

## COLLAPSING PARTIES

### *Plaintiff Florex*

In the final determination, Commerce determined that the Florex sub-group (Flores de Exportacion S.A., Agricola Guacari S.A., and Flores Altamira, S.A.) and the Santa Helena sub-group (Santa Helena S.A., Flores del Salitre Ltda., and S.B. Talee de Colombia Ltda.) were related, and "collapsed" them into a single entity, the Florex Group. 61 Fed.Reg. at 42,856. Commerce did not base the dumping margins for the Florex Group on data submitted by the individual companies. Instead, Commerce applied BIA rates of 6.74 percent, 7.09 percent and 6.97 percent for the fifth, sixth and seventh reviews respectively. *Id.* at 42,868. The margin for the collapsed companies was the weighted average of low Florex rates with Santa Helena's best information available rate of 76.60 percent. Florex Brief at 27 n. 56.

Florex argues that Commerce does not have the legal authority to collapse multiple parties and treat them as a single entity.[44] *Id.* at 27. This Court previously addressed this issue finding that Commerce does have the authority to collapse parties and treat them as a single entity for purposes of calculating dumping margins. *Queen's Flowers de Colombia v. U.S.*, 21 CIT —— at ——, 981 F.Supp. 617 at 622. Florex also argues that Commerce erred in using the related party definition found at 19 U.S.C.

§ 1677(13).[45] Florex Brief at 29. In Queen's Flowers, this Court held that section 1677(13) is the appropriate definition in the collapsing context. *Queen's Flowers*, 21 CIT at ——, 981 F.Supp. at 624.

As noted previously, Commerce's "related parties" analysis divides the Florex Group into two sub-groups. *See* Mem. from Michael F. Panfeld to File re: Collapsing Related Parties within the Florex Group (Nov. 15, 1994), Florex App., Non–Pub. Ex. 38 ("November Mem. I"). After deciding that the members of each sub-group were related, Commerce found that the Florex and the Santa Helena sub-groups which include all six member-companies, were related by means of a sister company relationship within the meaning of section 1677(13)(D) [46] through a series of holding companies. See Mem. from Michael F. Panfeld to Holly A Kuga re: Collapsing Related Parties within the Florex Group (Feb. 1, 1996), Florex App., Non–Pub. Ex. 36, at 3, n. 1 ("February Mem."). The three main shareholders of the holding companies, A, B and C,[47] together owned a majority share of the principal holding company during each review period. *Id.* at 3–4. Commerce found that during all three review periods, these main shareholders owned a direct 26.22 percent interest in the three members of the Florex sub-group. *Id.* During each period of review, the three shareholders also owned shares in the three members of the Santa Helena sub-group through their interest in the principal holding company.[48] *Id.*

---

**44.** Plaintiff Florex here adopts the arguments made by the plaintiffs in *Queen's Flowers de Colombia v. United States*, 21 CIT ——, 981 F.Supp. 617 (1997). Florex Brief at 29. Defendant also adopts all the arguments made in its brief to this Court in that case. *See* Def.'s Mem. Opp'n to Pl.'s Mot. J. Agency R. filed in *Queen's Flowers*, at 627–30.

**45.** Section 1677(13) governs when an exporter is to be regarded as related to its U.S. importer. 19 U.S.C. § 1677(13).

**46.** Section 1677(13) provides as follows:
For the purpose of determining United States price, the term "exporter" includes the person by whom or for whose account the merchandise is imported into the United States if ... (D) any person or persons, jointly or severally, directly, or indirectly, through stock ownership or control or otherwise, own or control in

the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States....
19 U.S.C § 1677(13)(D).

**47.** In order to preserve the confidentiality of the actual shareholders' identities, the Court denotes the shareholders as "A", "B" and "C".

**48.** Commerce then calculated the "effective" interests held in each company by the three main shareholders through their ownership of the various holding companies. See February Mem. at 3 n. 3. Commerce multiplied each individual's percentage ownership in a holding company by the percentage that holding company owned in each succeeding layer of other holding companies. *Id.* Together, the three shareholders effectively

894

■ Florex does not challenge any of these findings. Instead, Florex argues that Commerce does not have the legal authority to factor the *de minimis* holdings of an individual into its related party analysis, therefore, Commerce erred by including the holdings of shareholder B, who owns a significant portion of the Florex sub-group but an "insignificant percentage" of the Santa Helena sub-group, in its related party analysis.[49] Florex Brief at 29. Florex maintains once shareholder B's holdings are excluded, the remaining common shareholders of the Santa Helena sub-group lack the twenty percent ownership of the Florex Group required to meet the related party test.[50] *Id.*

The statute provides that parties are related when "any person or persons" own or control "jointly or severally, directly or indirectly, through stock ownership or control or otherwise, . . . in the aggregate 20 percent or more of the voting power or control in the business" of each party. 19 U.S.C. § 1677(13)(D)(emphasis added). Shareholders A and C, together, effectively owned 56.13 percent of Santa Helena during the fifth and sixth review periods and 64.13 percent during the seventh review period. See February Mem. at 3–4. Thus, a group of two persons, owned twenty percent or more of Santa Helena. These same two persons, along with shareholder B, also owned twenty percent or more of the other five Florex member-companies. *Id.* Commerce's decision to aggregate the interests of the three shareholders with common interests in several businesses was a reasonable application of the statute. See *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978)("When faced with a problem of statutory construction, this

Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.")(quoting *Unemployment Compensation Comm'n,* 329 U.S. at 153, 67 S.Ct. at 250).

■ After determining that the six Florex members were related, Commerce applied the remaining criteria of its collapsing test to determine whether the six member-companies should be treated as a single entity. The court in *Nihon Cement Co., Ltd. v. U.S.,* 17 C.I.T. 400, 1993 WL 185208, described the collapsing analysis as follows:

In determining whether to collapse entities, Commerce does not focus solely upon the degree of voting control one company may have over another, but upon a broad analysis of the facts in the case. . . . Other factors relied upon by Commerce in collapsing related companies are that (1) the companies are closely intertwined; (2) transactions take place between the companies; (3) the companies have similar types of production equipment, such that it would be unnecessary to retool either plant's facilities before implementing a decision to restructure either company's manufacturing priorities; and (4) the companies involved are capable, through their sales and production operations, of manipulating prices or affecting production decisions. . . . All of these factors need not be present as long as the parties are suffi-

owned a 56.14 percent share in Santa Helena and a 78.83 percent share in S.B. Talee, respectively, during the fifth and sixth review periods, as well as a 39.55 percent share in Flores de Salitre during the sixth review period. *Id.* During the seventh review period, they owned 64.14 percent of Santa Helena, 34.61 percent of Flores de Salitre and 78.93 percent of S.B. Talee. *Id.*

49. Florex does not deny that shareholder B owned a significant percentage in five of the six member-companies.

50. Florex also argues that Commerce's inclusion of shareholder B's *de minimis* interest in the

Santa Helena sub-group violates the principles articulated in *Nihon Cement Co. v. United States,* 17 CIT 400, 425–26, 1993 WL 185208 (1993)(finding that Commerce can only collapse parties where the type and degree of the relationship is so significant that there is a strong possibility of price manipulation). The Court does not agree. The court in *Nihon* discussed the significance of the type of relationship between firms only in the context of collapsing parties. *Id.* at 426–27. Nihon did not diminish Commerce's discretion concerning its related parties analysis.

ciently related to present the possibility of price manipulation.

*Nihon,* 17 CIT at 425, 1993 WL 185208.

In the final determination, Commerce stated,

> To determine whether companies should be collapsed, the Department makes three inquiries. First, the Department examines whether the companies in question are related.... Second, the Department examines whether the companies in question have similar production facilities, such that retooling would not be required to shift production from one company to another.... Third, the department examines whether there exists other evidence indicating a significant potential for the manipulation of price or production. The types of factors the Department examines include: (1) The level of common ownership; (2) the existence of interlocking officers or directors ...; and (3) the existence of intertwined operations.

61 Fed.Reg. at 42,853. In Queen's Flowers, this Court found Commerce's articulation of these collapsing factors to be in accordance with law. *Queen's Flowers,* 21 CIT at ——, 981 F.Supp. at 628 ("Although the factors listed by the Department in the Final Determination are not identical to those listed in Nihon, the Department has articulated a reasonable set of inquiries for answering the central question, whether parties are sufficiently related to present the possibility of price manipulation.").

However, Commerce's determination also must be supported by substantial evidence. In determining whether to "collapse" parties, Commerce examines the "level of interrelatedness" between parties, i.e., the "type and degree" of the relationship that exists among companies that produce the same product or can do so without too much difficulty. 61 Fed.Reg. at 42,853. Besides determining whether the parties are related, the criteria that Commerce considers in conducting its collapsing analysis include: (1) whether the companies in question have similar production facilities, such that retooling would not be required to shift production from one company to another; and (2) whether there exists other evidence indicating a significant potential for the manipulation of price or production. *Id.*

Florex challenges Commerce's analysis of the collapsing factors, arguing that the determination of the potential for price manipulation was not supported by substantial evidence. Florex Brief at 33.

Commerce found that all six companies produced carnations using virtually the same processes and equipment.[51] See November Mem. I, at 3.; see also November Mem. II, at 2. Commerce concluded that they had similar production facilities such that retooling was not required to shift production from one company to another. 61 Fed.Reg. at 42,856. Florex argues that collapsing was inappropriate because production shifting did not actually occur. Florex Brief at 33–35. However, the collapsing standard requires only an analysis based upon the potential for manipulation of production. *Nihon,* 17 CIT at 425–26, 1993 WL 185208. Commerce correctly focused upon the potential for the six companies to shift production. 61 Fed.Reg. at 42,856. As Commerce explained, in rejecting the same argument made by the Queen's Flowers Group:

> [O]ur concerns over shifting production refer to a longer period of time; thus, if Company A receives a lower margin than Company B, we are concerned that Company A would increase production of new flowers to take advantage of a lower margin while Company B would, over time, reduce production due to its higher margin. Alternatively, more of the production of Company A could be shifted to the U.S. market.

*Id.* at 42,854.

Further, in determining whether there is a significant potential for the manipulation of price or production, Commerce examines fac-

---

**51.** Even S.B. Talee, which primarily produced cuttings (baby carnation or mini-carnation plants) performed research and development activities using Santa Helena's farm and then sold the cuttings from this research to Santa Helena. See Mem. from Michael F. Panfeld to File re: Collapsing Related Parties within the Florex Group (Nov. 21, 1994), Def.'s Mem. Opp'n Florex's Mot. J. Agency R., Non–Pub. Ex. 8, at 2 ("November Mem. II").

tors such as: (1) the level of common ownership; (2) the existence of interlocking officers or directors; and (3) the existence of intertwined operations. *Id.* at 42,853.

As noted, Commerce found a significant level of common ownership among the six member-companies. Commerce also found that the six member-companies were operated and controlled by many of the same board members and operators. In fact, Santa Helena and the Florex Group have two board members in common: shareholders A and C, two of the three major shareholders of the six member-companies. November Mem. I, at 3; November Mem. II, at 1–2. Lorenzo de la Torre was the general manager of the two Florex farms and President of Four Farmers, the Group's commonly owned and operated U.S. importer. Lorenzo de la Torre's brother, Joaquin was the general manager of Santa Helena and of most of the holding companies owning Santa Helena. *Id.* Finally, two other members of the de la Torre family sit on the board of directors of each company. *Id.* Florex argues that the relationships were not sufficiently significant. Florex Brief at 35–36. The Court does not agree. The persons who owned the related companies also controlled and operated the companies by holding board and top management positions.

The third major factor that Commerce examined was whether the operations of the "companies are closely intertwined." 61 Fed. Reg. at 42,853. Commerce first considered whether record evidence demonstrated that the companies engaged in inter-company transactions. Commerce found that the six member-companies engaged in inter-company transactions, principally through Santa Helena's sales of flowers to the other companies for use in bouquets, November Mem. I, at 4, and S.B. Talee's sales of cuttings to other Santa Helena companies. See November Mem. II, at 2. Santa Helena and Salitre also sold subject flowers during each review through Four Farmers, the Group's commonly owned U.S. importer, just as the three Florex sub-group companies did. November

Mem. I, at 4. Florex maintains that these sales were made at arm's length and "companies that are intertwined do not deal with each other at arm's length." Florex Brief at 37. However, the collapsing standard does not require Commerce to distinguish between different types of inter-company transactions. *Nihon*, 17 CIT at 426, 1993 WL 185208. Commerce must only address whether transactions took place between the companies.

Commerce also determined that the closely intertwined relationship of the six member-companies provided them with access to one another's marketing and sales information. November Memo I, at 4. Commerce based this determination upon the extensive overlap in management and board memberships between all six producers as well as in Four Farmers. *Id.* Florex contends that Commerce was required to point to evidence that the companies actually shared information. Florex Brief at 38–39. Florex relies upon Nihon to support this argument. See *Nihon*, 17 CIT at 422–27, 1993 WL 185208 (reversing Commerce's determination to collapse Nihon and two related companies). The Nihon court found that the fact that related companies made sales through a joint sales company "did not in and of itself support [the conclusion] that the companies shared information." *Id.* at 427. Of critical importance to the court's decision, however, was the fact "there was no indication of an intertwined management structure as was present in other cases where Commerce collapsed related parties." *Id.* In contrast, the management structure of the Florex Group companies was significantly intertwined.[52] See November Mem. I, at 3.

The Court finds that there is substantial evidence on the record supporting Commerce's finding that the six member-companies are sufficiently related to present the possibility of price manipulation. Accordingly, Commerce's determination to collapse the six member-companies of the Florex Group was in accordance with law and was supported by substantial evidence.

---

**52.** The *Nihon* court also found that the chances of the companies sharing information was reduced because "they would have been subject to antitrust actions in Japan." *Nihon*, 17 CIT at 427, 1993 WL 185208. Florex pointed to no similar threat under Colombian law.

## VII.

### INTEREST INCOME OFFSET

#### Plaintiff Florex

During the PORs, the majority of the Florex Group's flowers were imported into the United States by Four Farmers, Inc. Non-Pub. Doc. No. 42, Def.'s Mem. Opp'n Florex's Mot. J. Agency R., Conf. Ex. 3 [hereinafter Def.'s Florex Conf. Ex.]. All sales made by the Florex Group for the U.S. market were invoiced to company X, which, in turn, invoiced the merchandise to Four Farmers. Id. at 5. By letters dated November 29, 1993 and May 16, 1994, the Florex Group filed questionnaire responses containing a statement of income for Four Farmers for the fiscal years ending in December 1991, December 1992, and December 1993. Id.; Non-Pub. Doc. No. 318, Def.'s Florex Conf. Ex. 4; and, Non-Pub. Doc. No. 504, Def.'s Florex Conf. Ex. 7. Four Farmers reported an interest expense of [* * *] for 1991, [* * *] for 1992, and [* * *] for 1993. Id.

In July 1994, Florex submitted its section C and D questionnaire responses for the three consolidated review periods, indicating that Four Farmers had no short-term borrowings other than loans from company X. See Non-Pub. Doc. No. 446, Def.'s Conf. Ex 5, at 23. Florex noted that since company X is a related company, loans made by X are "intracompany loans" and "adjusted" X's selling expenses. Id. at 23, 30.

In August 1994, Commerce forwarded a supplemental questionnaire to Florex, requesting that Florex "give a narrative description of company X's selling expense adjustments and provide a separate worksheet detailing the calculations." See Non-Pub. Doc. No. 468, Def.'s Florex Conf. Ex. 6. Florex submitted a response detailing the general expenses that it had reported originally for company X, including an offset to selling expenses, for short-term interest on deposits and loans. See Non-Pub. Doc. No. 504, Def.'s Florex Conf. Ex. 7, at 6–7. The response further specified that the adjustment made for interest income was related to "working capital." Id. at 7. However, Florex did not indicate whether the loans at issue were to related companies or linked to Florex's U.S. selling operations.

During the administrative review, the petitioners argued that Commerce erred in allowing Florex to offset its reported selling expenses because the short-term interest income is unrelated to the production of subject flowers. Pub. Doc. No. 1688, Def.'s Florex Pub. Ex. 2, at 66. In its rebuttal brief, Florex contended that Commerce should allow the offset as it "properly reflects the actual net selling expenses relating to [company X's] sales activities." Non-Pub. Doc. No. 1027, Def.'s Florex Conf. Ex. 9, at 50.

In the final determination, Commerce disallowed the offset. Commerce explained:

We examined the expenses reported by Florex's related selling agent and have determined that some, if not all, of the interest income derives from intra company loans. It is the Department's practice to ignore such intra company transfers.... For these final results, because we could not segregate the intra company loans from the interest income reported, we have denied the entire income interest adjustment.

61 Fed.Reg. at 42,846.

Florex argues that Commerce inappropriately increased Florex's reported selling expenses by disallowing the offset. Florex Brief at 40. Specifically, Florex maintains that Commerce erred in determining that company X's interest income was derived in part from intracompany loans because the interest income "had as its counterpart an equal interest expense reported by Four Farmers." Id. at 41. The record evidence, however, shows that the reported interest income significantly exceeded the reported interest expense. See Def.'s Florex Conf. Exs. 3, 4 (showing that Four Farmers' interest expense was [* * *] for 1991, [* * *] for 1992, and [* * *] for 1993); see also Def.'s Florex Conf. Ex 7, at 7 (showing that the short-term interest earned by company X on short-term deposits and loans was higher in each review period). Thus, contrary to Florex's claim, the interest income earned by company X did not offset the interest expense incurred by Four Farmers.

Florex also claims that it was denied an opportunity to comment on the interest income offset because "no issue regarding intracompany loans was ever raised by ITA or petitioners throughout the entire course of this review." Florex Brief at 40. The record shows, however, that Florex was aware that the offset adjustment was an issue. When Commerce's supplemental questionnaire requested that Florex provide a narrative description of company X's selling expense adjustments and provide a separate worksheet detailing these calculations, Florex was put on notice that Commerce was investigating the claimed offset. *See* Def.'s Florex Conf. Ex 6.

■ Finally, Florex argues that Commerce had no legal basis for resorting to BIA because there was no non-compliance with an information request. Florex Brief at 42. However, Commerce's denial of the offset is not equivalent to the application of BIA. See *Federal–Mogul Corp. v. United States,* 17 CIT 1093, 1103, 834 F.Supp. 1391, 1400 (1993)(finding Commerce's denial of an adjustment to foreign market value for post sale price adjustments and rebates was not a use of best information available when the parties had not shown that they met the statutory requirements to receive such an adjustment). Commerce disallowed the offset because Florex failed to establish that the claimed offset was directly related to U.S. sales of the subject merchandise and did not reflect an intracompany transfer. See Color Television Receivers From the Republic of Korea, 56 Fed.Reg. 12,701, 12,707 (Dep't Commerce 1991)(final det.)(finding that respondent failed to demonstrate that the category listed as other income related to the selling operations of the merchandise under review and excluding such income as an offset to the company's U.S. indirect selling expenses); Sodium Nitrate From Chile, 47 Fed.Reg. 51,460, 51,461 (Dep't Commerce 1992)(preliminary det.)("Interest income . . . not clearly related to selling the articles un-

der investigation may not be used to offset credit expenses.").

Accordingly, Commerce's disallowance of the offset was appropriate.

## VIII.

## COMMISSIONS PAID TO U.S. CONSIGNEES

### *Defendant–Intervenor FTC*

■ During the periods of review, certain Colombian exporters paid commissions [53] to two types of U.S. consignees—consignees related to the exporters by means of stock ownership ("related consignees") and consignees that had no financial ties to the exporters ("unrelated consignees"). Commerce deducted from the United States price ("USP"),[54] commissions paid to unrelated consignees by the exporters pursuant to 19 U.S.C. § 1677a(e)(1). 61 Fed.Reg. at 42,838. Commerce treated the Colombian exporters and related U.S. consignees as single entities. Commerce treated payments made to related consignees as intracompany transfers and not as "commissions," deducting from U.S. price only the U.S. selling expenses incurred by the related U.S. consignees pursuant to 19 U.S.C. § 1677a(e)(2). *Id.*

FTC argues that Commerce's failure to deduct commissions paid to "related" consignees in calculating USP was not in accordance with law. FTC Mem. Supp. Mot. J. Agency R. at 18 [hereinafter FTC Brief]. FTC claims that Commerce's approach understated exporter's sales price ("ESP") prices. *Id.*

Commerce uses ESP to calculate USP when sales occur between a foreign manufacturer and a related importer. ESP is the "price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter," minus specified adjustments. 19 U.S.C. § 1677a(c).

---

**53.** The antidumping statute does not define commission for the purposes of 19 U.S.C. § 1677a(e)(1).

**54.** Commerce calculates "United States price" ("USP"), based on purchase price ("PP"), or exporter's sales price ("ESP"), of the merchandise, whichever is appropriate. 19 U.S.C. § 1677a(a).

The statute provides that ESP shall be reduced by the amount, if any, of:

(1) commissions for selling in the United States the particular merchandise under consideration, (2) expenses generally incurred by or for the account of the exporter's in the United States in selling identical or substantially identical merchandise....

19 U.S.C. § 1677a(e). Commerce regulations include identical requirements mandating that "commissions for selling [merchandise] in the United States" be deducted from ESP. 19 C.F.R. § 353.41(e)(1).

To calculate ESP, Commerce first determines the price at which goods are sold to the first unrelated purchaser in the United States. Thus, Commerce "arrives at a United States price that reflects the price that the merchandise would command in 'an arm's length transaction,' whether from the importer to an independent retailer or directly to the public." *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1567 (Fed.Cir.1994) (quoting *Smith–Corona Group*, 713 F.2d at 1572).

Sales made on a consignment basis are ESP sales because the merchandise is sold in the United States "after the time of importation, by or for the account of the exporter...." 19 U.S.C. § 1677a(c).

The statute defines "exporter" to include the person by whom or for whose account the merchandise is imported into the United States if:

(A) such person is the agent or principal of the exporter, manufacturer, or producer;

(B) such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;

(C) the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or otherwise, any interest in any business conducted by such person;

(D) any person or persons, ... own or control ... 20 percent or more of the voting power or control....

19 U.S.C. § 1677(13).

According to FTC, all consignment relationships fall within the category of a principal/agent relationship.[55] FTC Brief at 19 Specifically, FTC argues that, because section 1677(13)(A) defines "exporter" to include an "agent" of the foreign manufacturer, all "commissions" paid to consignees should be deducted from ESP.[56] *Id.* FTC's interpretation of the statute stems from a misunderstanding of the nature of the ESP calculation. As discussed previously, ESP is calculated based on the arm's length price between an exporter and an unrelated third party. The purpose of the ESP selling expense adjustments is to determine "the net amount returned to the exporter." 61 Fed. Reg. at 42,838 (quoting S.Rep. No. 16, 67th Cong., 1st Sess. at 12 (1921)). Commerce

---

**55.** Because "agent" is not defined by statute, Commerce has developed a four-part test to determine whether a party is an agent within the meaning of section 1677(13)(A):

(1) whether the foreign manufacturer participates in the marketing of the product to U.S. customers;
(2) whether the foreign manufacturer participates in setting prices and in the negotiation of their terms of sales to U.S. customers;
(3) whether the U.S. customers look to the U.S. importer or the foreign manufacturer for product testing and quality control; and
(4) whether the foreign manufacturer interacts directly with U.S. customers

*See e.g., Furfuryl Alcohol From South Africa*, 60 Fed.Reg. 22,550, 22,552 (Dep't Commerce 1995)(final det.)(finding an agency relationship where there was continual communication between the foreign manufacturer and importer on matters related to U.S. customer marketing

and sales); *Electrolytic Manganese Dioxide From Japan*, 58 Fed.Reg. 28,551, 28,555 (Dep't Commerce 1993)(final det.)(finding no agency relationship where there was no evidence of involvement by the foreign manufacturer in setting the price and terms of sale with the U.S. end-user). FTC does not claim that "related" consignees meet Commerce's definition of agents.

**56.** FTC also argues that Commerce's approach in the present case is inconsistent with *Timken Co. v. United States*, 10 CIT 86, 630 F.Supp. 1327 (1986). FTC Brief at 21. FTC's reliance upon *Timken* is misplaced. The *Timken* court held that the statutory deduction for commissions did not require Commerce to also deduct the profit earned by a subsidiary. *Timken*, 10 CIT at 103, 630 F.Supp. at 1342. The *Timken* court, however, did not address the treatment of related party commissions. Therefore, Commerce did not act in a manner inconsistent with *Timken*.

appropriately deducted the selling expenses incurred by the related-party consignee as these expenses constituted payments by the "exporter" to unrelated third parties that affected the exporter's net return. Commerce stated that it was not deducting the payment from the producer to its related U.S. consignee in reimbursement of such selling expenses, since such commissions "are intracompany transfers that compensate the related consignee for selling expenses incurred by the consignee in the United States. Because these selling expenses are already deducted under our current methodology, the deduction of the intracompany 'commission' would result in double-counting." *Id.*

Therefore, the issue here is not the deduction from ESP of "commissions" paid to related parties, but whether Commerce's collapse of the exporter with the related consignee is permitted.

The statute itself does not require Commerce to disregard intracompany transfers; nor does it contain a standard for Commerce to determine when to collapse parties. "In a situation where Congress has not provided clear guidance on an issue, Chevron requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable." *Koyo Seiko,* 36 F.3d at 1573. The Court finds that Commerce's approach in the present case was reasonable.

"Collapsing" is within Commerce's discretion to define "related parties" according to the terms set out in section 1677(13). See 19 U.S.C. § 1677(13). Commerce's rationale for disregarding intracompany commissions is to avoid "double-counting" the related U.S. consignees' selling expenses. 61 Fed.Reg. at 42,838.[57] In accordance with section 1677a(e)(2), Commerce deducted selling expenses incurred in the United States. See 19 U.S.C. 1677a(e)(2). The intracompany "commissions" reimbursed the related U.S. consignee for these same expenses, which are already deducted under Commerce's methodology. Commerce's decision not to double-count deductions to U.S. price was reasonable in that it resulted in a fair "apples-to-

apples" comparison between U.S. price and foreign market value. *Koyo Seiko,* 36 F.3d at 1573 ("One of the goals of the [antidumping] statute is to guarantee that the administering authority makes the fair value comparison on a fair basis—comparing apples with apples")(quoting *Smith–Corona,* 713 F.2d at 1578).

▮ FTC alternatively claims that Commerce should have made a circumstance of sale ("COS") adjustment for the "commissions" under section 1677b. FTC Brief at 24. In determining foreign market value, "if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to ... other differences in circumstances of sale; ... then due allowance shall be made thereof". See 19 U.S.C. § 1677b(a)(4). Implementing this section, Commerce regulations provide "[d]ifferences in circumstances of sale ... normally are those involving differences in commissions, ..." 19 C.F.R. § 353.56(a)(2).

The circumstance of sale provisions do not include precise standards or guidelines to cover the exercise of Commerce's authority to determine adjustments. As the statute is silent, Commerce has broad discretion to decide what constitutes a bona fide circumstance of sale. *Smith–Corona,* 713 F.2d at 1571.

As noted, Commerce found that "commissions" paid to related consignees were intracompany transfers and not "true commissions." Because the "commissions" are not an expense, and the actual selling expenses are already deducted, there is no difference in expenses requiring adjustment. 61 Fed. Reg. at 42,838. In the final determination, Commerce explained, "we already deduct that portion of the transfer price [to the first unrelated customer] that represents selling expenses paid by the related U.S. consignee. The remaining portion—profit—does not qualify as a circumstance-of-sale adjustment." *Id.* This reasoning has been upheld by this court. See *Outokumpu Copper*

**57.** Additional adjustments to ESP include Commerce's deduction of selling expenses incurred in the United States. See 19 U.S.C. § 1677a(e)(2); see also 19 C.F.R. § 353.41(e)(2).

*Rolled Products AB v. United States,* 18 CIT 204, 209, 850 F.Supp. 16, 21 (1994)("Commissions paid to related parties are considered intra-company transfers of funds, and, as such do not qualify for a circumstances-of-sale adjustment.").

FTC argues that Commerce's methodology in the present case conflicts with *LMI–La Metalli,* 912 F.2d 455. FTC's reliance upon LMI–La Metalli *is inapposite.* LMI–La Metalli involved commissions paid in the home market where the selling agent was related to the producer but the manufacturer and the agent were not treated as a single entity. *Id.* at 458. Moreover, Commerce's approach in the present case was not inconsistent with *LMI–La Metalli.* The *LMI–La Metalli* court held that it was an error for Commerce to deny an adjustment for home market related-party commissions when adequate evidence supported a finding (1) that the commission's were at arm's length, or (2) the commissions were directly related to the sales under review. Here there was no issue of an arm's length sale.

Accordingly, Commerce's treatment of commissions was in accordance with law.

### IX.

### CALCULATION OF FMV

#### *Defendant–Intervenor FTC*

 In the final determination of the second review of Certain Fresh Cut Flowers From Colombia, 55 Fed.Reg. at 20,492–93, Commerce decided not to base FMV on third-country sales to Europe because of the disparate flower market patterns which existed between the United States and Europe.[58] In the final determination of the present case, Commerce found "no change in the differences in market volatilities, no change in the differences in holidays, and no change in the differences in end-use of the merchandise." 61 Fed.Reg. at 42,841. Commerce concluded that "the differences in prevailing market conditions between European markets, which comprise the primary third-country markets, and the United States in these PORs are still too great to justify use of third-country sales to determine foreign market value." *Id.* In deciding not to use third-country sales data Commerce only examined information about third-country markets and not actual company-specific sales price data. *Id.*

The antidumping statute provides that foreign market value shall be the price "at which such or similar merchandise is sold, or . . . offered for sale in the principle markets of the country from which exported . . ." See 19 U.S.C. § 1677b(a). As noted, the statute sets forth three methods for determining foreign market value: home market sales; third country sales; and constructed value. *Id.* If home market sales are inadequate, foreign market value may be determined based on constructed value, notwithstanding third country sales. *Id.* At the same time, Commerce's regulations show a preference for third country prices if adequate and verifiable information is available.[59] 19 C.F.R. § 353.48(b). However, the statute also gives Commerce the discretion to reject third-country prices in favor of constructed value when there is an adequate factual basis in the record for doing so. *Floral Trade Council,* 15 CIT at 499, 775 F.Supp. at 1496.

The issue is whether there is substantial evidence to show that the differences in prevailing market conditions are sufficient to overcome the preference for third-country sales. When examining Commerce's factual

---

58. In the second review of this proceeding, Commerce gave three reasons for rejecting third-country sales: (1) prices in the United States and third-country markets were negatively correlated; (2) Colombian producers sold to Europe only in peak months, making it difficult to find contemporaneous sales; and (3) the perishability of fresh cut flowers leads to price differences that are unrelated to dumping. 55 Fed.Reg. at 20,-492–93. These factors were approved by this court as an adequate basis for rejecting third-country sales prices as a basis for calculation of foreign market value. *Floral Trade Council,* 15 CIT at 500–501, 775 F.Supp. at 1497–98.

59. This court has implicitly endorsed the preference for third-country sales to constructed value when there is adequate confirmation of third-country sales subject to timely verification. *Smith–Corona,* 713 F.2d at 1576 n. 20; *Southwest Florida Winter Vegetable Growers Ass'n v. United States,* 7 CIT 99, 102, 584 F.Supp. 10, 14 (1984).

determinations, the court's function is to determine whether Commerce's determination is reasonable and supported by the record as a whole. *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1563 (Fed.Cir.1984). FTC argues that Commerce must first examine actual company-specific third-country price data in order to reject third-country sales as a basis for foreign market value. FTC Brief at 30. This court has rejected this argument. See *Asociacion Colombiana,* 13 CIT at 25, 704 F.Supp. at 1124 ("ITA is not required to eliminate third-country prices as a possible surrogate for home market price before resorting to constructed value."); *Smith–Corona,* 713 F.2d at 1576 n. 20 ("constructed value may be used without regard to availability of third-country prices...."). Congress provided for this flexibility to facilitate efficient administrative decisions. *Asociacion Colombiana,* 13 CIT at 25, 704 F.Supp. at 1124.

FTC also argues that Commerce rejected third-country prices based on irrelevant factors regarding market comparability. FTC Brief at 33. Specifically, FTC maintains that in the final determination, Commerce unlawfully relied upon analysis from the second review in reaching its determination. FTC Brief at 29–30. However, the record demonstrates that Commerce did collect information regarding market comparability in the final determination. The Department examined "narrative responses to questions regarding third-country markets, ranging from general questions about market conditions to questions about specific companies' practices, experiences, and average profit levels." 61 Fed.Reg. at 42,841. In addition, Commerce received price data for standard carnations for 1991 from the FTC for the United States and for the Aalsmeer market in Europe. *Id.*

FTC maintains that the factors cited by Commerce are "irrelevant in the absence of a finding that these market conditions will cause the creation of dumping margins." FTC Brief at 34. For example, FTC main-

tains that Commerce failed to explain how the existence of different holidays in the United States and Europe create dumping margins.[60] *Id.* However, as noted, third country prices may be abandoned if there is an adequate factual basis upon the record for doing so. *Floral Trade Council,* 15 CIT at 499, 775 F.Supp. at 1496.

Commerce explained that the differences in market conditions between the United States and Europe center upon the flower-buying habits of consumers in the United States compared to those in Europe. 61 Fed.Reg. at 42,842. For example, there are certain flower-buying holidays, such as Valentine's Day and Mother's Day, for which demand for flowers in the United States increases markedly. *Id.* In contrast, Commerce found that "third-country market customers more often buy flowers for everyday use, such as decoration." *Id.* Commerce concluded that the end-use of the subject merchandise significantly differs between the United States and third-country markets. *Id.*

Commerce also found that as a result of the holiday-driven buying habits of U.S. consumers, significant price increases occurred during specified U.S. holidays that were not sustained during the rest of the year. *Id.* at 42,841. The extreme price volatility found by Commerce in the U.S. flower market contrasted with the agency's findings with regard to the European flower market.

FTC also contends that market price data in its February 18, 1994 submission, demonstrates that the correlation between prices in third-country markets and the United States was sufficiently strong. FTC Brief at 32. But Commerce examined FTC's price data and determined that "third-country and U.S. prices moved in opposite directions in approximately half the months of the year" and concluded that the data was inconclusive. 61 Fed.Reg. at 42,842. Commerce explained that "differences in holidays [are] one reason

---

**60.** FTC also argues that Commerce's decision ignores the effect of Colombian flowers sold on consignment in the United States, but on a fixed price basis in European markets. FTC Brief at 38. However, FTC never raised this issue during the administrative review. See FTC Ex. 22 (FTC Case Brief, Aug. 11, 1995). Thus, FTC has failed to exhaust its administrative remedies. *Unemployment Compensation Comm'n,* 329 U.S. at 155, 67 S.Ct. at 251. Accordingly, the Court will not address this argument.

why there are significant differences in demand patterns between the markets...." *Id.* at 42,841. Commerce's conclusion that sufficient differences rendered comparison between prices in third-country markets and the United States impossible was sufficiently supported by the record. Accordingly, Commerce's determination was in accordance with law and was supported by substantial evidence.

## X.

### THIRD COUNTRY SELLING EXPENSES

#### *Defendant–Intervenor FTC*

█ In its CV calculations Commerce included amounts for general expenses and profits based upon respondents' U.S. selling expenses and the eight-percent statutory minimum profit.[61] 61 Fed.Reg. at 42,837. Commerce did not use third-country general expenses and profits because it had rejected third-country sales as the basis for calculating foreign market value. *Id.* FTC argues that Commerce should have used actual third-country general expenses and profits in its CV calculations. FTC Brief at 40.

The antidumping statute provides that constructed value shall include "an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation...." 19 U.S.C. § 1677b(e)(1)(B). Accompanying regulation 353.50(a) states that

the amount for general expenses shall not be less than ten percent of the cost of manufacturing and that the amount for profit shall not be less than eight percent of the sum of the amount for general expenses and the cost of manufacturing. 19 C.F.R. § 353.50(a)(2).

The statute does not mandate a particular methodology for calculating general expenses and profit.[62] When a statute is silent or ambiguous with respect to a specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291–92, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). The Court finds that Commerce's approach represents a permissible construction of the statute.

Commerce based selling expenses, an aspect of general expenses, upon respondents' U.S. selling expenses. Commerce explained that its practice is to use U.S. selling expenses as a surrogate when home market and third-country market sales form an inappropriate basis for FMV. 61 Fed.Reg. at 42,843; *see Tubeless Steel Disc Wheels From Brazil,* 52 Fed.Reg. 8,947, 8,948 (Dep't Commerce 1987)(final det.)(using U.S. selling expenses as a surrogate when respondent did not have home or third-country sales of the same general class or kind of merchandise); *Granite Products From Italy,* 53 Fed.Reg. 27,187, 27,191 (Dep't Commerce 1988)(final det.)(finding no comparability between sales in the home market and sales in the United States and using U.S. selling expenses as a surrogate for each individual U.S. product for which constructed value was computed).[63]

---

**61.** Commerce used the ten-percent statutory minimum for general expenses for those companies whose actual U.S. general expenses where less than ten percent of the cost of materials and fabrication. 61 Fed.Reg. at 42,837. Commerce used the eight percent statutory minimum for profit for all respondents because all respondents reported home market profits less than the statutory minimum. *Id.*

**62.** The legislative history is similarly silent on this issue. See S.Rep. No. 249, 96th Cong., 1st Sess. at 214–15 (1979).

**63.** However, there are some determinations in which Commerce has taken a different position. *See e.g., Color Television Receivers, Except for Video Monitors, From Taiwan,* 56 Fed.Reg. 31,-

378, 31,385 (Dep't Commerce 1991)(final det.)("There is no provision within the statute instructing [Commerce] to use U.S. selling expenses as a surrogate for general expenses in the constructed value calculation"). FTC argues that Commerce's past practice requires the Department to use actual third-country general expenses and profits in its CV calculations in this case. The Court does not agree. It is "a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure." *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988); see *supra* p. 880 and note 20. Here, Commerce explained that comparisons to third-country prices would be distortive, and thus, not form an appropriate basis for FMV. 61 Fed.Reg. at 42,842.

FTC challenges Commerce's methodology, arguing that third-country selling expenses are the appropriate proxy. FTC Brief at 40. But Commerce found that disparate market conditions between the U.S. and European markets rendered sales to third-country markets inappropriate for comparison with U.S. sales. 61 Fed.Reg. at 42,842 ("Just as home market and third-country prices will not provide an accurate measurement of dumping in this case, the general expenses and profit associated with these sales are not of the amount 'usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration.'")(quoting 19 U.S.C. § 1677b(e)(1)(B)). Commerce's approach has been endorsed by this court. In *Zenith Electronics Corp. v. United States*, 15 CIT 394, 770 F.Supp. 648 (1991), the court disagreed with Commerce's practice of using expenses associated with insignificant home-market sales to make circumstances-of-sale adjustments to constructed value. *Zenith Electronics Corp.*, 15 CIT at 403–04, 770 F.Supp. at 657 ("Logical consistency should dictate that if sales in the home-market are so insignificant that they lead Commerce to reject them as a source of foreign market value and choose constructed value instead, the actual selling expenses associated with those insignificant home market sales should also not be relied upon for any related purposes.").

64. FTC also maintains that Commerce's approach was not reasonable because "use of an annual constructed value based on third-country selling expenses and profit would not generate the same concerns" as the use of monthly third-country sales prices. FTC Brief at 41. Specifically, FTC argues "constructed value is a period average over a one-year period, general expenses and profits will not be volatile; nor given annual averaging can it be argued that general expenses and profits can create dumping margins by virtue of timing. Holidays do not affect average expenses and profits so long as both markets observe holidays." *Id.* at 42. But Commerce found that differences in holidays do exist. 61 Fed.Reg. at 42,841. Commerce explained:

> With regard to holidays, we observe that differences in holidays are not in and of themselves a reason for rejecting third-country sales, but are a significant factor in explaining why there is no apparent correlation between prices in third-country markets and the United States. Furthermore, we are not convinced by FTC's claims that flower-buying holidays in third-

It was reasonable for Commerce to reject third-country expense and profit data when it had determined that third-country sales could not provide an appropriate basis for comparison.[64] Thus, Commerce's use of U.S. selling expenses as a surrogate for general expenses was in accordance with law.

For profit calculation in this case, Commerce utilized the eight-percent statutory minimum because there were no cases in which a respondent's home-market profit exceeded eight percent. 61 Fed.Reg. at 42,843. This approach was upheld in *Alhambra Foundry Co., v. United States*, 12 CIT 343, 685 F.Supp. 1252 (1988)(approving the use of the statutory minimum profit when the respondent companies had no viable home market or third-country market sales).

Accordingly, Commerce's decision to calculate constructed value using reported U.S. selling expenses and the statutory eight–percent minimum for profit was in accordance with law.

## XI.

## CASH DEPOSIT INSTRUCTIONS

### *Defendant–Intervenor FTC*

■ Paragraph 3 of Commerce's cash deposit instructions provided as follows:

> country markets and the United States largely coincide. For example, the FTC argues that All Soul's Day, a European flower-buying holiday, coincides with Halloween.
> This is true, but because Halloween is not a holiday for which people in the United States typically purchase flowers, observing that the two holidays coincide does not demonstrate that third-country and U.S. flower-buying holidays coincide.

*Id.* More importantly, FTC's claim is besides the point. When third-country sales have been rejected as an appropriate basis for comparison, the profit and expenses of goods sold in the third country are not those reflected in sales of merchandise of the same class or kind.

FTC also claims it "is not rational to argue that demand conditions which may cause short-term peaks and valleys in prices, have a distorting effect on annual expenses and profits." FTC Brief at 42. But Commerce found that "the differences in volatility between third-country markets and the United States are largely attributable to differences in demand patterns." 61 Fed.Reg. at 42,841.

2. If any entries of this merchandise are exported by a firm other than the grower, then the following instructions apply:

A. If the exporter of the subject merchandise has its own rate, use the exporter's rate for the cash deposit rate.

B. If the exporter of the subject merchandise does not have its own rate, but the grower has its own rate, the cash deposit rate will be the grower's rate.

C. Where neither the exporter nor the grower currently has its own rate, or the grower is unknown, use the all others rate for establishing the cash deposit rate.

Cash Deposit Instructions, dated Aug. 22, 1996, FTC App., Ex. 1, at 2.

FTC argues that Commerce's instructions "permit Colombian flower growers to avoid antidumping duty deposits at the rates specified" in Commerce's final determination. FTC Brief at 36. FTC alleges Commerce's cash deposit instructions undermine the "remedial purpose of the statute." *Id.* at 44. Specifically, FTC maintains that "paragraph A does not account for the scenario in which both the exporter and the grower have their own rates," and "paragraph C encourages importers to report only the exporter's name on entry documents." *Id.*

The antidumping statute provides that whenever a determination (preliminary or final) is made, Commerce shall "notify the petitioner and other interested parties of its determination, and of the facts and conclusions of law upon which the determination is based, and shall publish notice of its determination in the Federal Register." 19 U.S.C. § 1673b(f). Section 1675(a) authorizes Commerce to conduct periodic administrative reviews of an antidumping duty order upon the request of an interested party. See 19 U.S.C. § 1675(a). Further, section 1675(a)(2) provides that Commerce shall "publish notice of the results of the determination ... in the Federal Register, and that determination

shall be the basis for ... deposits of estimated duties." 19 U.S.C. 1675(a)(2).

The statute is silent with regard to the methodology that Commerce must employ in determining cash deposits. "In a situation where Congress has not provided clear guidance on an issue, Chevron requires us to defer to the agency's interpretation of its statute as long as the interpretation is reasonable." *Koyo Seiko,* 36 F.3d at 1573; *see CEMEX, S.A. v. United States,* 20 CIT ——, ——, slip op. 96–132, at 20, 1996 WL 467731 (Aug. 13, 1996)(noting that the inherent imprecision of estimating future cash deposit rates grants Commerce substantial discretion in the selection of its methodologies). Commerce's approach in this case represents a permissible construction of the statute.

Cash deposit rates are based on estimated antidumping duties on future entries. See 19 U.S.C. §§ 1673f, 1673b(d)(2), 1673e(a)(3); *Torrington Co. v. United States,* 44 F.3d 1572, 1578 (Fed.Cir.1995)(holding that (1) "Title 19 requires only cash deposit estimates, not absolute accuracy," and (2)"these estimates need only be reasonably correct pending the submission of complete information for an actual and accurate assessment"). Commerce's instructions in the present case meet this standard.[65]

■ FTC also argues that Commerce improperly failed to give interested parties an opportunity to comment on the cash deposit instructions. FTC Brief at 46. The Statements of Administrative Action submitted to Congress concerning the amendment of the antidumping law in 1979, offer some guidance regarding this issue. These Statements explain that "[t]he Authority shall afford interested parties an opportunity to comment on the proposed determination and publish the determination of revised net subsidies or margins of dumping in the Federal Register, including the bases for the assessment of duties on the merchandise included within the determination." *See Statements of Administrative Action,* H.R. Doc. 153, Part II, 96th Cong., 1st Sess. at 429 (1979). The Statements recognize the importance of the

**65.** Apparently, FTC would deny to Commerce the discretion to choose between the exporter's and grower's rates when both have a rate. Nothing in the statute limits Commerce's choice in this situation.

opportunity to comment on the determination and thus provide for input from interested parties prior to publication. That opportunity was provided here when Commerce allowed the filing of case briefs. The Statements, however, do not require Commerce to provide parties a second opportunity to comment after cash deposit instructions have been issued to Customs. Accordingly, Commerce's approach here was appropriate.

## XII.

### PUBLICATION OF COMPANY–SPECIFIC MARGIN

#### Defendant–Intervenor FTC

In the seventh review period, Commerce initiated a review of Flor Colombia, S.A. In responses to Commerce's questionnaire, Flor Colombia submitted a certification from the Colombian government that it was no longer in business and, thus, was unable to respond to Commerce's questionnaire. Based upon this submission, in its preliminary results, Commerce assigned Flor Colombia a second-tier BIA rate during the seventh review. *Preliminary Results*, 60 Fed.Reg. at 30,273. However, in the final determination, Commerce did not list a company-specific rate for Flor Colombia in the margin tables that listed the weighted average dumping margins for all reviewed respondents. 61 Fed.Reg. at 42,865–71. These same margin tables were used to prepare the cash deposit instructions issued to Customs.

Commerce concedes that the omission of a company-specific rate for Flor Colombia was due to a clerical mistake and requests a remand on this issue. Def.'s Mem. Opp'n FTC's Mem. Supp. Mot. J. Agency R. at 41–42. Pursuant to 19 U.S.C. § 1675(a), which requires Commerce to publish the results of administrative reviews, the Court is remanding this issue to give Commerce an opportunity to correct this error.

## CONCLUSION

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

ORDERED that the Department of Commerce's final determination in *Certain Fresh Cut Flowers From Colombia*, 61 Fed.Reg. 42,833 (Dep't Commerce 1996)(final results admin rev.) is sustained in part and remanded in part; and it is further

ORDERED that Commerce's adjustments for inflation are sustained; and it is further

ORDERED that the issue of Commerce's treatment of imputed credit expenses is remanded for further consideration in accord with the Court's opinion; and it is further

ORDERED that the issue of Commerce's treatment of U.S. selling expenses is remanded for further consideration in accord with the Court's opinion; and it is further

ORDERED that Commerce's treatment of cost of production is sustained; and it is further

ORDERED that Commerce's decision to use best information available for Flores del Rio's inflation adjustments is sustained; and it is further

ORDERED that Commerce's decision to apply a first-tier best information available rate to Eden Floral Farms is sustained; and it is further

ORDERED that Commerce's decision to apply a first-tier best information available rate to Equiflor is sustained; and it is further

ORDERED that Commerce's decision to apply a second-tier best information available rate to Floralex is sustained; and it is further

ORDERED that the issue of Commerce's use of best information available to adjust Florex's crop adjustment calculations is remanded for further consideration in accord with the Court's opinion; and it is further

ORDERED that Commerce's decision to collapse the Florex Group member-companies into a single entity is sustained; and it is further

ORDERED that Commerce's disallowance of Florex's interest income offset is sustained; and it is further

ORDERED that Commerce's treatment of commissions is sustained; and it is further

ORDERED that Commerce's calculation of foreign market value is sustained; and it is further

ORDERED that Commerce's calculation of general expenses and profit is sustained; and it is further

ORDERED that Commerce's cash deposit instructions are sustained; and it is further

ORDERED that the issue of Commerce's publication of a company-specific margin Flor Colombia, S.A., is remanded for further consideration in accord with the Court's opinion; and it is further

ORDERED that the remand results are due on **June 26, 1998**; comments and responses are due on **August 7, 1998**; any rebuttal comments are due on **August 28, 1998**, and it is further

ORDERED that plaintiffs' motions are denied in all other respects and the final results of the administrative reviews are sustained in all other respects.

### *MEMORANDUM OPINION & ORDER*

On April 22, 1998, pursuant to U.S. CIT Rule 59(a), Plaintiff, Equiflor Corporation ("Equiflor"), filed a motion for reconsideration of the Court's judgment in *Asociacion Colombiana de Exportadores de Flores v. United States*, 22 CIT ——, slip op. 98–33 (Mar. 25, 1998)("*Asociacion Colombiana*").

Plaintiff argues that in *Asociacion Colombiana* the Court overlooked the critical argument presented by Equiflor that a company whose assets have been sold and that was dissolved is not capable in law or in fact of receiving delivery of an antidumping questionnaire. Equiflor Mem. P. & A. Supp. Mot. Recons. at 4 ("Equiflor Mot.").

### Background

The background to this case is set forth in the Court's prior opinion. There, the Court sustained the application by the Department of Commerce ("Commerce") of the first-tier 76.60 percent best information available ("BIA") rate to the flower grower El Majui ("Majui") because of the company's failure to respond to the Department's questionnaire. *Asociacion Colombiana*, 22 CIT at ——, slip op. 98–33, at —— - ——. Thereby, the Court denied the motion for judgment on the agency record filed by Equiflor, the importer of Majui's flowers. *Id.*

### Discussion

■. A motion for reconsideration under U.S. CIT Rule 59 is within the sound discretion of the court. *St. Paul Fire & Marine Ins. Co. v. United States*, 16 CIT 984, 984, 807 F.Supp. 792, 793 (1992), *aff'd*, 16 F.3d 420 (Fed.Cir.1993); *Sharp Electronics Corp. v. United States*, 14 CIT 1, 2, 729 F.Supp. 1354, 1355 (1990). The purpose of a rehearing is not to relitigate the case but, rather, to rectify a fundamental or significant flaw in the original proceeding. *Arthur J. Humphreys, Inc. v. United States*, 15 CIT 427, 427, 771 F.Supp. 1239, 1241 (1991), *aff'd* and *adopted*, 973 F.2d 1554 (Fed.Cir.1992). If the moving party fails to "establish that there was a fundamental or significant flaw in the conduct of the original proceedings," this will result in the motion being denied. *Brookside Veneers, Ltd. v. United States*, 11 CIT 197, 199, 661 F.Supp. 620, 622 (1987), *rev'd on other grounds*, 6 Fed. Cir. (T) 121, 847 F.2d 786, *cert. denied*, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988).

■. Equiflor claims that the Court overlooked the critical issue in finding that Majui received service of Commerce's questionnaire because the company had gone out of business prior to the questionnaire being sent out. Equiflor supports its contention by (1) citing to Chicago *Title & Trust Co. v. Forty-one Thirty–Six Wilcox Bldg. Corp.*, 302 U.S. 120, 124–25, 58 S.Ct. 125, 82 L.Ed. 147 (1937)(noting that the dissolution of a corporation puts an end to its existence, the result of which may be likened to the death of a natural person), and (2) alleging that, under Colombian law, commercial entities lose all legal status upon dissolution and liquidation and are therefore incapable of receiving service of documents, and can only be the subject of legal proceedings that were initiated prior to the act of dissolution. Equiflor Mot. at 4.

The issue in *Title Co.* was whether a dissolved corporation itself could initiate legal proceedings after the two year post-dissolution period provided by Illinois law. 302

U.S. at 123–27, 58 S.Ct. 125. In contrast, here the administrative review was initiated by Commerce against the company eight months after it was dissolved. The *Title Co.* court expressed no opinion as to whether proceedings could be instituted against a dissolved corporation. *Id.* Thus, *Title Co.* is inapposite.

Equiflor's citations to the Colombian law are also not persuasive.[1] The fact that Majui had "legally dissolved" under Colombian law is not dispositive with respect to Commerce's determination that the company received the questionnaire.[2] Rather, the question presented is whether Commerce's conclusion that Majui received its questionnaire and subsequent application of BIA to the company was supported by substantial evidence.

When examining Commerce's factual determinations to decide whether they are supported by substantial evidence, the court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [Commerce's] conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)(quoted in *Matsushita Electric Industrial Co., Ltd. v. United States,* 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) (citations omitted).

Section 776(c) of the Tariff Act of 1930, as amended 19 U.S.C. § 1677e(c)(1988), states that Commerce "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." Under Commerce's regulations, BIA is used whenever the Department (1) Does not receive a complete, accurate, and timely response to Commerce's request for factual information; or (2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted. 19 C.F.R. § 353.37(a).

In *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1190 (Fed.Cir.1993), the Federal Circuit approved a BIA scheme in which Commerce selects first-tier BIA when a respondent refuses to cooperate with its requests for information or significantly impedes the administrative review, and second-tier BIA, which is less adverse, when a respondent substantially cooperates but still fails to provide requested information in a timely manner or in the required form. *Id.* at 1190–91.

In the final results, Commerce stated that Majui had not provided evidence that the Department's service of its questionnaire was defective. *Certain Fresh Cut Flowers From Colombia,* 61 Fed.Reg. 42,833, 42,862 (Dep't Commerce 1996)(final results admin. reviews). If Commerce found service to be defective then it would have applied the "all others" 3.10 percent rate to the company. By way of example, Commerce explained that it applied the "all others" rate to another flower grower, My Flowers, because the company provided evidence that service was defective. *Id.* Specifically, My Flowers maintained that the address to which the Department sent materials was out of date. In support of this argument, My Flowers provided registration certificates from the Colombian Chamber of Commerce, authenticated by the U.S. Embassy and the Ministry of Foreign Relations. *Id.* My Flowers also claimed that the company at its old address

---

1. Specifically, Equiflor notes that under Colombian law, commercial entities such as Majui lose all legal status upon dissolution and liquidation, and are therefore incapable of receiving service of documents. Equiflor Mot. at 4 (citing Commercial Code of Colombia, Article 222.) Equiflor also points out that the Colombian Council of State has held that a corporation that has been liquidated can only be the subject of legal proceedings that were initiated prior to the act of dissolution. Equiflor Mot. at 4 (citing Council of State Opinion 3769 (Feb. 19, 1993)).

2. Even if a corporation is dissolved, it will generally wind down its business.

received the questionnaire, but failed to let My Flowers know of its arrival. My Flowers submitted documentation supporting that the individual who signed the delivery record for the questionnaire was not a My Flowers employee. *Id.*

Equiflor argues that service of Commerce's questionnaire to Majui was defective. To support this argument, Equiflor claims that the courier that had allegedly delivered the questionnaires to a number of flower growers, including Majui, was unable to supply proof of delivery when requested to do so. Equiflor Mot. at 2, n. 4. However, the courier letter dated July 19, 1995, from TNT Skypack International Express to the respondent's law firm explains the circumstances: because TNT had changed local agents, it could not obtain copies of original receipt signatures for its May 1994 deliveries. Equiflor Mot. Ex. A. Subsequently, Commerce also sent a copy of the questionnaire via Federal Express in August, 1994. Equiflor Mot. Ex. B. The second delivery was acknowledged with the signature of an individual, Maria Christina Vargas. *Id.* Equiflor argues that Ms. Vargas could not have been employed by Majui, since the company had ceased to exist one year earlier. Equiflor Mot. at 3. However, Equiflor provides no evidence to support this assertion.

In this case Commerce investigated over three hundred producers and/or exporters of the subject merchandise. *Certain Fresh Cut Flowers From Colombia,* 60 Fed.Reg. 30,270 (Dep't Commerce 1990)(prelim. results admin. reviews). Pursuant to the Department's usual practice Commerce forwarded its questionnaire to the respondents under investigation to the address listed for each company.[3] Many of these were small family-owned companies. *See e.g.,* Pls.' Equiflor & Espirit Miami Mem. Supp. Mot. J. Agency R. at 3–5 (noting that Sunset Farms, owned by a husband and wife, operated a single farm, and sold flowers produced by a smaller farm,

El Paico, owned by their daughter). A number of firms were dissolved or sold during the period of investigation. *See e.g.,* Eden's Mem. Sup. Mot. J. Agency R. at 3–4 (stating that in May 1994, the shareholders of Groex, S.A. resolved to liquidate the company); Pls.' Equiflor & Espirit Miami Mem. Sup. Mot. J. Agency R. at 3–5 (noting that in March 1993, the family owning Sunset Farms decided to leave the flower business and sold the main farm to Flores El Roble); 61 Fed.Reg. at 42,836 (stating that Agricola de los Alisos, Colflores, Flores Estrella, Flores Mountgar, and Flor Colombia S.A. were no longer in business).

 Under these circumstances, where a questionnaire is acknowledged and accepted for delivery twice, Commerce may reasonably conclude that the receiver will either respond or direct the questionnaire to the appropriate party. The burden is then on the respondent to provide evidence that service was defective. *See Williams v. Administrator of NASA,* 59 C.C.P.A. 1329, 463 F.2d 1391, 1400 (C.C.P.A.1972)("[W]here a party is in a position to have peculiar knowledge of the facts with regard to an issue, the burden of proof as to that issue lies upon that party.")(citing McCormick, Evidence, § 337 (2d ed.1972)), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3013, 37 L.Ed.2d 1003 (1973). This rule is particularly appropriate in this case because of the administrative burden that Commerce faced. Moreover, any other policy would allow respondents to avoid answering Commerce's questionnaires by simply rearranging or reorganizing companies in order to evade service. As Commerce explained in the final results, "failure to apply a non-cooperative BIA rate to Flores el Majui would reward non-compliance with our administrative review and would encourage other firms to liquidate themselves and reincorporate under new names." 61 Fed.Reg. at 42,862.

---

**3.** Commerce's regulations require the Department to examine "normally . . . not less than 60 percent of the dollar value or volume of the merchandise" sold during a period of investigation. 19 C.F.R. § 353.42(b)(1). To determine which companies in a given country are responsible for these sales, Commerce requests certain commercial information from the appropriate

U.S. embassy. ITA *Antidumping Manual,* Ch. 4. at 7 (Rev.6/93). Since most respondent companies are represented by legal counsel, presentation of the Department's questionnaire is often made to attorneys at the Department of Commerce offices. If the respondent is not represented, the questionnaire is delivered via mail or international air express. *Id.* at 10.

In conclusion, there is no record evidence to suggest that either the first or second deliveries were unreliable. Thus, the Court did not "overlook" any evidence in assessing whether substantial evidence supported Commerce's determination. Accordingly, the Court denies Equiflor's motion for reconsideration.